RAILWAY EXPRESS AGENCY, INCORPORATED, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 7886.   Promulgated May 13, 1947.

*Floyd F. Toomey, Esq.*, and *John P. Lipscomb, Jr., Esq.*, for the petitioner.

*Harold D. Thomas, Esq.*, for the respondent.

992

OPINION.

Disney, *Judge*: The petitioner reported taxable net income each year and paid the resulting taxes. In arriving at net income it took as deductions amounts paid to the railroads as rail transportation revenue computed in accordance with provisions of the express operations agreements. Our attention has not been called to the manner in which the amounts were reflected in the returns. Account No. 104, under the name of "Express Privileges" of the uniform system of accounts, which system was prescribed by the Interstate Commerce Commission and followed generally by petitioner in filing its returns, provides for charges thereto for amounts paid or accrued to railroads "for the privilege of conducting an express business over transportation lines." About $58,000,000 in 1937 and $50,000,000 in 1938 was claimed in the returns as deductions in account No. 104 in arriving at revenue from transportation. It seems, therefore, that rail transportation revenue

distributable to the railroads under the express operations agreements was included in such deductions as business expenses. The idea is consistent with the view of respondent upon brief that rail transportation revenue was payable to the railroads for services, and included their profit, if any, for services performed by them. The petitioner also reflected in its returns tax-exempt interest, capital gain in 1938, and nondeductible fines paid, and deducted capital losses (limited each year to $2,000). The only adjustment made by the respondent in his determination of the deficiencies was to reduce each taxable year the amount of depreciation claimed. Accordingly, regardless of how rail transportation revenue was reflected in the returns as an offset against gross income, the amounts were not disturbed by the respondent and are not expressly in issue. There is no controversy as to the proper amounts allowable as deductions for depreciation.

The primary and general issue raised by the petitioner is whether any part of its receipts in the taxable years constituted income taxable to it. The claim of petitioner that it erroneously paid income taxes has its foundation in the theory that it had no income subject to tax. The substance of the petitioner's argument is that it is a creature of the railroads and, as such, acts as their agent in conducting, under uniform contracts, an express transportation business for them over their lines; that it is accountable to its principals, the railroads, for all gross revenue, less expenses, as determined in accordance with provisions of the express operations agreements, and, therefore, can not have net income available for dividends or credit to surplus. Petitioner says that under the circumstances the railroads, not it, were the beneficial owners of all of its income. Its contention does not go so far as to deny that it is a taxpayer. The effect of its whole argument is that, in substance at least, all of its gross income and expenses, as defined in the express operations agreements, which necessarily include tax-exempt income and nondeductible expenses and losses, constitute income and expenses of the railroads and that all of any excess of income over expenses, classified as rail transportation revenue in the uniform contracts, belongs to the carriers in the proportions fixed by the agreements as the beneficial owners thereof. Such transportation revenue, with adjustments for nondeductible expenses for tax purposes, would, petitioner says, constitute taxable income of the recipient railroads.

As already indicated, this proceeding had its origin in increases of taxable net income reported by petitioner resulting from partial disallowance of deductions taken for depreciation. Without such adjustments there would not have been any deficiencies. The substance of the argument being made by the respondent to support his action

is that petitioner was by nature a corporation organized for profit; that it was more than a mere agent for the railroads; that all of petitioner's income, gross or net, is not under its charter, bylaws, or the uniform contracts distributable to the railroads as a matter of right, and that petitioner had a real surplus by at least the amount of depreciation charged in excess of the amount actually sustained. The crux of what he says is that petitioner should be regarded here as like other corporations subject to income tax liability.

The respondent, upon brief, says that "Where income is derived from property, the basic test for determining who is to bear the tax is that of ownership." A like statement, with the same citations of authority, was made by him in *Worth Steamship Corporation*, 7 T. C. 654. There we agreed that the statement was "fundamentally correct." There is little, if any, difference between it and the contention of petitioner here that the tax should be borne by the beneficial owner. See *Helvering* v. *Horst*, 311 U. S. 112; *Commissioner* v. *Smith*, 324 U. S. 177. All facts must be considered in the application of the rule. *Commissioner* v. *Wilcox*, 327 U. S. 404.

Was the petitioner a mere agent of the railroads? Its predecessor in the handling of express, the American Railway Express Co., was an independent corporation that transacted business for its own account. The railroads over whose lines substantially all of the express business of the country was handled sought to substitute for the arrangement they had with American a plan under which they could manage and control the business and at periodical times receive its net revenue. The organization of petitioner resulted from the adoption of a plan for such operation. Such railroads subscribed and paid for petitioner's nominal capital of $100,000 in proportion to the express business handled by them in the past. They are still its stockholders, except for an additional railroad system and changes resulting from mergers and consolidations, and they manage and control petitioner through a board of directors elected by them. Other funds necessary for working capital and the acquisition of property of American were raised by a bond issue of petitioner in the amount of $32,000,000 under a trust indenture.

Each express operations agreement designates petitioner as the exclusive agent of the railroad for conducting the express transportation business and for the collection and disbursement and division under the agreement of all revenue under the agreements. The qualified appointment of petitioner as agent discloses that the agency was not to extend to all matters. For instance, petitioner had authority to file tariffs and other rules and regulations with the Interstate Commerce Commission on its own behalf or on behalf of the railroads, and as between petitioner and the railroads the former

was liable for loss to its own property or carried property, etc., and for injury to its own employees and agents. We see nothing in the agreement limiting the right of petitioner to appoint and exercise control over its employees. Numerous provisions of the contracts contemplate disagreements between the parties—inconsistent with a position of petitioner as mere creature of the railroads.

Property used by the petitioner in carrying out its activities was owned by it and no contention is made that the contracting railroads, as alleged beneficial owners of all of the income of petitioner, had any interest in such property. Nothing found in the express operations agreements as executed, which define the rights of the parties, gives the railroads any interest in petitioner's property.

The express operations agreements were pledged as security for the payment of principal and interest on petitioner's outstanding bonds. In case of default under the bonds, the trustee was empowered to take possession of and use and operate petitioner's properties, collect and receive all of its earnings, and, after paying expenses of operation, apply the proceeds on the payment of the bonds and interest thereon in default. If certain defaults continued for 30 days, the trustee, in his discretion, was authorized to, and, if the holders of at least 25 per cent in amount of the outstanding bonds requested it to do so, was required to, sell the trust estate to satisfy the claims of bondholders. Only petitioner was liable under the bonds. Thus the income of petitioner was, at all times important, subject to use by the trustee for payment of the bonds and interest thereon in default. Claims of the contracting railroads to rail transportation revenue were subordinate thereto. The trust indenture is independent of the express operations agreements and illustrates the absolute control petitioner had over its property and the breadth of its power to prefer claims of holders of bonds in default to rights of railroads to rail transportation revenue.

The trust indenture is dated March 1, 1929, when the express operations agreements became effective. A bond issue was provided for in the express plan, which became effective earlier, in October 1928, as of July 2, 1928, by agreement of railroads representing in the aggregate 75 per cent of about 98 per cent of the express business then being conducted. Under the circumstances it is apparent that the beneficiaries chiefly interested in the rail transportation revenue of petitioner were fully aware, not later than March 1, 1929, of the charge being placed upon revenue by provisions of the trust indenture. It is evident that petitioner's property, in which the railroads, as parties to the express operations agreements, had no interest, was a material income-producing factor. Furthermore, we find in the contracts executed nothing contrary to the view that upon any liquidation any

net assets after paying claims of creditors would be distributable, not to the railroads as principals under the express operations agreements, but to petitioner's stockholders.

Terms of the express operations agreements fixed the amounts payable to the participating railroads as, briefly, gross revenue less expenses. The agreements contemplate that all income and expenses, as defined therein, including depreciation, should be taken into account in arriving at the amount distributable to the railroads in proportion to the express business each handled on its line. We discern nothing in the agreements as made or carried out entitling the railroads to gross income or any part thereof, as such, or liability for all expenses of petitioner. Certain fines were imposed upon petitioner and funds which the railroads had no unconditional present right to receive were used to pay them. If during the years the fines were imposed, and thereafter during the life of the express operations agreements, petitioner had deficits in rail transportation revenue, the burden of the deficits never would have fallen upon the railroads, parties to the agreements, in view of the fact that no provision was made in the express operations agreements imposing upon them liability to make good operating losses of petitioner.[1]

Article v of the express operations agreements authorized petitioner to deduct from the moneys received by it, as expense, certain items therein designated net income items, including appropriations from "net income" for investment in physical property (account No. 330); and to deduct certain "surplus" items, including account No. 411, for "surplus set aside for investment in physical property." Account No. 411 has never been used by the petitioner. No evidence was submitted respecting whether account No. 330, a similar account, was used, though the returns filed by petitioner for the taxable years, in which income and expenses are identified by account numbers, contain no reference to account No. 330. The express operations agreements did, however, give petitioner the right to treat such accounts as expense deductions. Such provisions appear to enable the petitioner to increase its physical properties out of funds which would otherwise be distributable to the contracting railroads. Such permitted appropriations for property would constitute income to the petitioner. Such a situation is incompatible with a view that the petitioner is a mere creature of the contracting railroads.

The indenture contained a provision requiring petitioner to set aside out of its rail transportation revenue every six months as a sinking fund

---

[1] It is evident that the participating railroads contemplated that the operations of petitioner each month would result in rail transportation revenue distributable to them; otherwise nothing would accrue to them for the part they played in earning gross income. It may be that if a deficit occurred in operations any month, the loss could be recovered from subsequent earnings of petitioner by a charge to profit and loss for use as an expense deduction the next month.

for the bonds, an amount equal to the principal amount of bonds payable in such six-month period. Other provisions made indebtedness of petitioner to the railroads which had signed express operations agreements subordinate to the bonds, and prohibited modification of the express operations agreements without the written consent of the trustee. In lieu of such a sinking fund, petitioner made interest-bearing loans every six months from its railroad stockholders to take up matured bonds. The record is silent on whether the trustee ever consented to the new plan and we, therefore, assume that the indenture was never modified in that respect. Accordingly, notwithstanding the new plan, the trustee had a contractual right to require deposits of rail transportation revenue in a sinking fund to pay bonds maturing every six months. The obligation encroaches upon the right of the railroads to all of the income of petitioner.

The petitioner owned, in large amounts, bonds, which it used to meet requirements of state laws, and upon which it received interest. There was no assumption of or agreement to pay, by the participating railroads, all of petitioner's debts or expenses. Theoretically, if not practically, the petitioner might have more expense than income, and we see no requirement that the railroads who are, alleged to be principals pay such excess expense or losses, as in some cases involving this problem. The petitioner was plainly no mere department of another organization, such as in *National Carbide Corporation*, 8 T. C. 594, where the principal or parent furnished all necessary working capital. There are various provisions in the contract providing for settlement of disputes between petitioner and the railroads. Petitioner's returns discuss depreciable property owned, but not used in express operations by petitioner, approximately 75–80 structures. These properties were depreciated by the petitioner under the unit basis, and not under the group method prescribed by the Interstate Commerce Commission and used on operating properties. The contract refers more than once to items to be furnished by the railroads without compensation other than as provided in "Article v," or "Article iv and v," indicating that the payments provided by such articles as above discussed do constitute compensation from petitioner and not, as petitioner argues, mere division of profits of the contracting railroads' business. The petitioner's corporate powers were very broad, encompassing much more than an express business, and income is not all shown to be from that business. All these elements contradict, in our view, the idea that the petitioner is in all things a mere agency of the railroads in the express business, and tend to show it to be a contractor with relation to them. In our opinion, the evidence before us falls short of demonstrating that the petitioner is a mere creature of the railroads contracting with it, with no income of its own.

The case of *Bowles* v. *Railway Express Agency, Inc.*, 65 Fed. Supp. 852, cited by the petitioner, involved an alleged violation of the Emergency Price Control Act of 1942 for overcharges in sales of certain miscellaneous services of a local nature. The turning point of the case was on the question of whether the defendant (petitioner here) rendered services as a seller.

The services involved in that litigation were not used by all of the railroads using the facilities of petitioner and the charges made were as nearly as possible at cost, because, if services were performed for less than cost, lines not using the service, but parties to the express operations agreements, would be required to absorb the loss. The status of the defendant as a taxpayer was not involved in the suit. The remark of the court, that "The liability of the defendant as a separate corporate entity for taxes or torts is immaterial in considering whether a specific statute or regulation applies to it," discloses that the court did not regard its opinion as an authority for judging whether petitioner might have income subject to tax. Furthermore, the facts of the case disclose that the petitioner contracted for its services on terms which contemplated that its charges would be sufficient to cover all expenses, including fines, for the service, leaving no deficit to be made good by rail transportation revenue derived from its general activities.

In *Horace Mill*, 5 T. C. 691, the transaction was in the nature of a joint venture, in which each participant was entitled to a specified proportion of the income, without deductions for any purpose. The case of *Louis C. Rollo*, 20 B. T. A. 799, did not go so far as to hold that the corporation involved had no income subject to tax, or that expenses, nondeductible by it for tax purposes, must be reflected in the returns of the individuals. The corporation was treated as a separate entity, subject to tax on its gross income, and the deduction there in controversy was allowed as a business expense upon the ground that it was consideration payable under the contract that produced the gross income. The amount paid there may be likened to the rail transportation revenue paid by petitioner here to the railroads, and allowed by the respondent as a deduction. A similar case is *Grey Bull Corporation*, 27 B. T. A. 853. There, however, the nondeductibility for tax purposes of expenses incurred in arriving at the amounts payable under the contracts with shareholders was not involved. The case of *Uniform Printing & Supply Co.* v. *Commissioner*, 88 Fed. (2d) 75, turned on whether the amounts were rebates or dividends. We agree with petitioner that rail transportation revenues payable by it to railroads under the express operations agreements were not dividends. The respondent did not so treat them. In *Worth Steamship Corporation*, *supra*, the corporation held only record title to the vessel and merely managed and operated the property for the beneficial owners, who were joint venturers. The issue did not involve the question of whether

some part of the amounts paid to the joint venturers as beneficial owners of the income derived from operation of the vessel included items nondeductible for tax purposes.

Though the general purpose of the express plan was to enable the contracting railroads to obtain the maximum amount out of the express business, and thus receive themselves the net earnings that had been going to American, petitioner's predecessor, the terms of the agreements later entered into did not go so far as to make the gross income and expenses of petitioner gross income and expenses of the contracting railroads in any proportion. Petitioner, as a taxpayer, was required to account for its gross income pursuant to provisions of the applicable revenue act and, in doing so, to disregard, if necessary, accounting rules prescribed by the Interstate Commerce Commission. *Old Colony R. Co.* v. *Commissioner*, 284 U. S. 552. The contracting railroads were entitled to the rail transportation revenue, but such amount may not, under the circumstances here, be considered merely a part of gross income earned by the contracting railroads and not the petitioner, and computed without regard to nondeductible expenses and tax-exempt income. We conclude that it was not error for respondent to treat as petitioner's income the amounts reported by it in its returns.

However, the point upon which the respondent determined the deficiencies, and involving the larger portion thereof, is whether the petitioner had income subject to tax by virtue of deduction of excessive depreciation. Aside from the more general conclusions to which we have above come as to the position of the petitioner being that of recipient of the gross income, more particular reasons also require the conclusion that the Commissioner did not err in taxing to the petitioner an amount agreed to, the amount of the excessive depreciation deduction. For even though we were to assume that it had been shown that the contracting railroads, and not the petitioner, were the recipients of the gross income involved from the express business and that in conducting such business the petitioner was doing so as agent for them, the fact still remains that in one respect, at least, petitioner was no mere agent. It contributed to the contract and to the business the use of property to the extent of millions of dollars. Most of the $32,000,000 bond issue was expended upon property. Such property belonged solely to the petitioner and petitioner was solely responsible for the bond issue with which it was purchased. Assuming that there may be question as to whether property later purchased out of the revenues of the business belonged in any sense or degree to the contracting railroads—although we find nothing in the contract specifically so providing—it appears reasonable to conclude from the evidence that far the larger portion of the property owned

by the petitioner in the taxable years was free from any claim on the part of the contracting railroads. This being true, it is obvious that the depreciation items which the Commissioner reduced were deducted by the petitioner as the alleged agent of the contracting railroads, but for the benefit of itself in a different capacity, i. e., as the owner of the depreciating property.

Considering the whole contract, and particularly the way in which neither the stockholders of the petitioner nor the contracting railroads became liable for either the debts in general or the bonds of the petitioner, and the lack of provision for division of the property among all the roads at the end of the contract, we think that the petitioner as a corporate entity was the owner of the property both in form and in fact. Why should the 70 railroads, owning petitioner's stock and advancing the money to discharge its bonds, provide, for the rest of the 400 roads, the property for the express operations for the benefit of all? In short, we consider the provision of the contract with each contracting railroad with respect to depreciation as a provision whereby the petitioner was to pay itself, in effect, a sufficient amount to take care of the depreciation on its own property. The contract sets a certain standard for the amount of deduction, that is, as provided by article v (D) of the contract. Thereunder depreciation shall be deducted "as defined in the Uniform System of Accounts or the rulings of the Interstate Commerce Commission in connection therewith." It is to be noted that the deduction for depreciation is not to be designated as actual depreciation or as depreciation as determined by the Commissioner of Internal Revenue, but in accordance with Interstate Commerce Commission rules. In accordance therewith, the petitioner did, in the taxable years, deduct depreciation according to such rules. That the amount so deducted was greater than the Commissioner's determination of depreciation appears to us immaterial. In our opinion, however much the petitioner was the agent of the contracting railroads in conducting the express business, it was dealing at arm's length with them in protecting itself against actual depreciation upon the property which it put into and used in the business, and that therefore it received, in its individual capacity, in the taxable years, the amounts which were deducted for depreciation.

There is clear demarcation between the petitioner, owned by 70 railways, and 400 participating in the express operating agreements; and demarcation in their interests. The Commissioner of Internal Revenue, upon examination of the situation, determined—and properly the parties agree—that the amounts deducted as depreciation represented considerably more than the reasonable wastage or depreciation upon the property. Thereby petitioner in our opinion,

had income under the facts before us, within the broad reach of section 22 (a) of the Internal Revenue Code. Petitioner is, in this respect, in no essentially different position from the ordinary taxpayer owning property used in business and upon which it deducts depreciation. If it deducts too much, the Commissioner will disallow the excess over reasonable depreciation as he determines it, adding an amount equivalent to such excess to the taxpayer's net income as reported. Petitioner, as owner, received from the contracting railroads amounts greater than those determined by the Commissioner to be reasonable depreciation deductions, and, as the agency contracts did not give the contracting railroads a right to such amounts, the excess deductions were properly added to net income as reported.

Petitioner argues, however, in effect, that the matter was subject to revision between it and the contracting railroads and, further, that in 1945 the Interstate Commerce Commission gave permission to account for depreciation charges on the basis found by the Bureau of Internal Revenue, retroactive to January 1, 1937, and so covering the taxable years. We do not think this controls the instant case. In the first place, the action of the Interstate Commerce Commission in 1945 does not, in fact, change the rules under which the petitioner deducted its depreciation under article v, section 4 (D) of the contract. Careful examination of the action by the Interstate Commerce Commission reveals that the petitioner was granted permission to account for depreciation charges on the basis found by the Bureau of Internal Revenue, "effective with the account for August 1945." Then follows the proviso: "That nothing herein contained shall be construed as prohibiting said Express Agency from applying the said permission retroactively to January 1, 1945"—which was later by amendment changed to January 1, 1937. In short, the Interstate Commerce Commission merely did not prohibit the petitioner from applying the depreciation rates and figures found by the Bureau of Internal Revenue for 1937 and 1938, the taxable years here. But this the petitioner has never done. It has refrained from revising, in this depreciation matter, its accounts with the contracting railroads. This proceeding was pending at the time the situation was under discussion, and questions are pending between the petitioner and the Bureau of Internal Revenue. In other words, the petitioner has left the contractual rights of itself and the contracting railroads as they were when petitioner deducted depreciation under Interstate Commerce Commission rules. It seems to us that the question as to whether petitioner might be required by the contracting railroads to revise its depreciation deductions for 1937 and 1938, under the Interstate Commerce Commission order of 1945 is, to say the least, an open one; and particularly that petitioner has advisedly left it open in this case,

leaving itself in the position of having deducted depreciation for 1937 and 1938 according to the then rulings of the Interstate Commerce Commission and in strict accordance with its contractual right. A taxpayer receiving income under claim of right and without restriction as to disposition, is taxable thereon, even though he may later be required to return it. *North American Oil Consolidated* v. *Burnet*, 286 U. S. 417; *National City Bank, Executor* v. *Helvering*, 98 Fed. (2d) 93; *Board* v. *Commissioner*, 51 Fed. (2d) 73; *Safety Tube Corporation*, 8 T. C. 757, where the claim was in litigation. This we consider petitioner's position as the owner of the depreciated property, and even though there may be some liability to revise the matter later—and the words of the contract might be construed as strong basis for petitioner's denial of any such revision—that is not for us to consider controlling as to the years 1937 and 1938. Moreover, the provisions of the contract with reference to any revision are general in their nature and subject to question as to the time within which such revision may be applied. Thus, article xviii of the contract provides for objections to deductions within a reasonable time; also provides against retroactive effect to actual expenses already paid or incurred as being unnecessary or excessive, though it provides also that estimates and accruals (which would include estimates and accruals as to depreciation rates), agreed to by the petitioner as excessive, may be adjusted from the dates thereof. Obviously, there is real question as to the rights of the parties, the petitioner and the contracting railroads, as to revision of the deductions taken by the petitioner in the taxable years. The depreciation, already deducted, might not be regarded as merely estimated, or the petitioner might not agree that it was excessive. The operations contracts, article v, section 4, contain in detail the provisions above examined, as to revenues and expenses to be deducted therefrom; article v, section 5, provides in general terms for final settlement at termination of the agreement by the general accounting officers of the parties, or if they fail to agree, as provided in article xiv; and article xiv in turn provides in general for arbitration of disputes on request "and the decision of a majority of such arbitration board shall be a condition precedent to *any further action.*" (Italics supplied.) Thus it appears that there may be litigation—"further action"—between the parties, and we can not now say that the matter of the depreciation will ever be revised. In view of the question as to the relation between petitioner and the contracting railroads as to any revision of accounts, we may not properly be required to speculate upon the attitudes and contentions which might be raised between the parties in the future. Under the principles of the cases last cited, we consider that we should not anticipate the possibility of any revision. We therefore conclude and hold that the Com-

missioner did not err in adding to petitioner's income as reported, the agreed amounts of excessive deductions for depreciation.

In the light of the above conclusions, there remain for disposition several alternative contentions. Several of them have been agreed upon by the parties, will be reflected in decision entered under Rule 50, and require no discussion here. The petitioner has not briefed a contention by the respondent that he erred in allowing $100,000 as petitioner's adjusted declared value of petitioner's capital stock for the year ended June 30, 1937, and that such value is zero. Moreover, the parties stipulate that for 1936 petitioner's deductions allowable for income tax purposes exceeded its gross income by more than $101,403.87. Since, under section 105 of the Revenue Act of 1935, as amended by section 401 of the Revenue Act of 1936, capital stock value originally declared shall, for a later year, be the original amount minus the excess of deductions allowable for income tax purposes over gross income, and since the original declared value was $100,000, it appears that for 1937 the proper figure is zero. The respondent's contention is sustained.

This leaves for further consideration only the question whether the Commissioner, in computing undistributed net income subject to surtax on undistributed profits for the year 1937, erred in denying credit of the amount of petitioner's adjusted net income, under section 26 (c) (1) of the Revenue Act of 1936,[2] providing for credit in connection with written contracts restricting payment of dividends. In our view, the Commissioner did so err. The petitioner had, prior to May 1, 1936, executed written contracts (with each of the contracting railroads). If such contracts contained a provision "expressly" dealing with the payment of dividends, which would be violated by the distribution of petitioner's adjusted net income, the petitioner's position is sound. The contract was not an intracorporate matter, such as a charter, bylaw, or corporate resolution, which does not cause benefit of the credit. *Helvering* v. *Northwest Steel Rolling Mills, Inc.,* 311 U. S. 46; *Metal Specialty Co.,* 43 B. T. A. 891; affd., 128 Fed. (2d) 259. It provided a method of distribution of the petitioner's income to the contracting railroads by adding together its income, and making

---

[2] SEC. 26. CREDITS OF CORPORATIONS.

In the case of a corporation the following credits shall be allowed to the extent provided in the various sections imposing tax—

* * * * * * *

(c) CONTRACTS RESTRICTING PAYMENT OF DIVIDENDS.—

(1) PROHIBITION ON PAYMENT OF DIVIDENDS.—An amount equal to the excess of the adjusted net income over the aggregate of the amounts which can be distributed within the taxable year as dividends without violating a provision of a written contract executed by the corporation prior to May 1, 1936, which provision expressly deals with the payment of dividends. If a corporation would be entitled to a credit under this paragraph because of a contract provision and also to one or more credits because of other contract provisions, only the largest of such credits shall be allowed, and for such purpose if two or more credits are equal in amount only one shall be taken into account.

certain deductions, by classes, and "other deductions," which specifically included "accounts listed under * * * Caption IV [*as defined by the Uniform System of Accounts prescribed by the Interstate Commerce Commission*] 'Disposition of Net Income' except Account 329 entitled 'Dividend Appropriations of Income.' " In other words, the petitioner could not deduct dividends, under the contract, before distributing its net income to the contracting railroads. In this we see the "prohibition on payment of dividends," which forms the heading of section 26 (c) (1) and the kind of contract permitting the credit. We think, contrary to respondent's view, that the contract does expressly deal with dividends. Petitioner's position is sustained.

*Decision will be entered under Rule 50.*