## COMMISSIONER OF INTERNAL REVENUE v. NATIONAL CARBIDE CORPORATION.

### SAME v. AIR REDUCTION SALES CO.
### SAME v. PURE CARBONIC, Inc.
### Nos. 161–163, Docket 20749–20751.

Circuit Court of Appeals, Second Circuit.

March 31, 1948.

Before L. HAND, SWAN and FRANK, Circuit Judges.

Hilbert P. Zarky, of Washington D. C., and Theron Lamar Caudle, Asst. Atty. Gen., Sewall Key, Lee A. Jackson, and George A. Stinson, Sp. Assts. to Atty. Gen., for petitioner.

John A. Wilson, of New York City (Shearman & Sterling & Wright and Harry W. Forbes, all of New York City, Raymond N. Beebe of Washington, D. C., and Willard M. L. Robinson, of New York City, of counsel), for respondents.

L. HAND, Circuit Judge.

This case comes before us upon three petitions of the Commissioner to review orders of the Tax Court en banc, which expunged deficiencies in income, and declared value excess profits taxes assessed against the taxpayers. The Commissioner had assessed each of the three companies in question upon the theory that they had

received incomes during the year 1938; but the Tax Court held that "they were operated as branches or divisions" of their parent—the Air Reduction Company, Inc., of New York—and that for this reason their net income was taxable against it and not against them. This is the only issue involved, and the facts as found by the Tax Court were in substance as follows.

All the shares of each of the companies, as well as of a fourth not here involved, were owned by the Air Reduction Company, Inc., which we shall speak of as "Airco," and which was engaged in four major fields of manufacture, in each of which it made use of one of the subsidiaries. One—Air Reduction Sales Company— extracted and sold the constituents of air; another—National Carbide Corporation— made and sold calcium carbide; a third— Pure Carbonic, Inc.—made carbonic acid gas which it sold in gaseous, liquid and solid forms; the fourth, manufactured electric welding machines and the like. We need not speak of the series of combinations, dissolutions and associations by which "Airco" became the owner of the shares of the subsidiaries, because before 1938 the legal relations between them had been so simplified that each was operating under separate contracts, which were so nearly alike that one will serve as a pattern for all. The substance was as follows. The parent employed the subsidiary "as its agent to manage and operate * * * all plants for the production" of the products assigned to that particular subsidiary, and for the "manufacture of apparatus and containers" to transport the products; and it also employed the subsidiary "as its agent to market and sell * * * the output of all such plants." It agreed to give the subsidiary "the use of all cylinders, containers, motor trucks, equipment, and shipping facilities which it now owns or may hereafter acquire * * * to supply such working capital" as the subsidiary might need; "* * * to provide such executive management * * * and office accommodation and facilities as may be necessary for the proper conduct" of its business. In return, the subsidiary agreed "to manage and operate * * * said plants, * * * to maintain the same in first class condition, * * * to distribute, market and sell the product manufactured, * * * to pay all expenses of such operation, maintenance and selling * * * to collect all * * * proceeds resulting therefrom, * * * to credit monthly on its books to Airco all profits * * * above an amount equal to six per cent (6%) per annum on its outstanding capital stock, which said amount it is hereby authorized to deduct and retain, and it hereby agrees to accept as full compensation for its services," and "to pay over to Airco upon demand, any profits becoming due." The accounts were kept strictly on this basis; "Airco" furnished all the assets held or used by the subsidiaries, and paid for them out of its own treasury; the officers of each subsidiary were officers of "Airco"; and the directors were directors of "Airco," and never met except formally to ratify what had been done by the officers or directors of "Airco." One general main office in New York was maintained for all, and the direction and management of each was immediately conducted by "Airco." Upon this evidence the Tax Court found that the subsidiaries were merely "the corporate agents of Airco and were operated as incorporated branches or divisions of Airco"; and that "the income from the operations of petitioners which is in excess of six per cent of petitioners' outstanding capital stock belonged to and was the income and property of Airco as principal." Upon this finding it held that the case fell within the decision of the Supreme Court in Southern Pac. Co. v. Lowe,[1] and our decision in Munson S. S. Line v. Commissioner,[2] and expunged the assessments. Three judges dissented.

The question when a wholly owned subsidiary of a parent corporation shall be treated for purposes of income taxation as a separate taxable person, and when as merely a part of the corporate activities of the parent, has caused much difference of judicial opinion. In Southern Pac. Co. v. Lowe[1] the Supreme Court treated the subsidiary as a mere screen and held that the

---

[1] 247 U.S. 330, 38 S.Ct. 540, 62 L.Ed. 1142.

[2] 2 Cir., 77 F.2d 849.

income was the parent's. We ventured to explain this decision—especially in the light of Lynch v. Turrish,[3] and Lynch v. Hornby,[4] both decided the same day—on the ground that all the income had been earned before the Sixteenth Amendment had become effective;[5] and the same explanation would cover Gulf Oil Co. v. Llewellyn,[6] which came shortly thereafter. Be that as it may, in Burnet v. Commonwealth Imp. Co.[7] the Court declared that neither decision could "be regarded as laying down any general rule authorizing disregard of corporate entity in respect of taxation"; and that both "cases presented peculiar situations." That is of course a familiar resource when a court wishes to escape an earlier decision which it is not willing any longer to treat as authoritative; and in Moline Properties, Inc. v. Commissioner,[8] the Court expressly declared that both decisions had been "held to lay down no rule for tax purposes." In National Investors Corporation v. Hoey[9] and again in Paymer v. Commissioner,[10] we declared, as best we could, what we understood that case to decide, and perhaps we shall gain nothing by going over the ground again. However, since the Tax Court after the fullest deliberation has come to an opposite conclusion, our unfeigned deference to it makes it, if not imperative, at least appropriate, for us to give our reasons for adhering to our former position. Moline Properties, Inc. v. Commissioner, supra,[8] which, as the last declaration of the Supreme Court, must be taken as authoritive, did indeed recognize that there were occasions on which the formal existence of the subsidiary should be diregarded, but these were limited to cases where "the corporate form * * * is a sham or unreal." We think that the citation of Gregory v. Helvering,[11] as authority for this, meant that the subsidiary was a "sham" when it was not created or used for some business purpose, but as a screen for another corporation which, or an individual who, was conducting the business. In Gregory v. Helvering[11] the taxpayer had organized a corporation only to serve as a means of transfer; it was used once and only for that purpose, and was dissolved as soon as it had done so. The Court held that it was not a "corporation" within the meaning of that term, as Congress must be understood to have used it, because in common speech, it means a jural person created to conduct industry, commerce, charity or some other commonly practised activity, and not to serve merely as an escape from taxation. Such a corporation might be in some contexts a "corporation"; but words are chameleons, which reflect the color of their environment, and in a tax statute "corporation" could not have been so intended.

This decision has at times been thought to trench upon the doctrine—which courts are never tired of repeating—that the rights resulting from a legal transaction otherwise valid, are not different, vis-a-vis taxation, because it has been undertaken to escape taxation. That is a doctrine essential to industry and commerce in a society like our own, in which, so far as possible, business is always shaped to the form best suited to keep down taxes. Gregory v. Helvering, supra,[11] was no exception, in spite of the fact that it was the purpose for which the taxpayer created the corporation that determined the event; for it is not the presence of an accompanying motive to escape taxation that is ever decisive, but the absence of any motive which brings the corporation within the group of those enterprises which the word ordinarily includes. Indeed, a corporation may be a "sham" and "unreal," when the only reason for its creation was "to deter the creditors of one of the partners," who

---

[3] 247 U.S. 221, 38 S.Ct. 537, 62 L.Ed. 1087.

[4] 247 U.S. 339, 38 S.Ct. 543, 62 L. Ed. 1149.

[5] Nixon v. Lucas, 2 Cir., 42 F.2d 833.

[6] 248 U.S. 71, 39 S.Ct. 35, 63 L.Ed. 133.

[7] 287 U.S. 415, 420, 53 S.Ct. 198, 199, 77 L.Ed. 399.

[8] 319 U.S. 436, 439, 63 S.Ct. 1132, 1134, 87 L.Ed. 1499.

[9] 2 Cir., 144 F.2d 466.

[10] 2 Cir., 150 F.2d 334.

[11] 293 U.S. 465, 55 S.Ct. 266, 79 L.Ed. 596, 97 A.L.R. 1355.

organized it, for that is not an activity commonly understood to be corporate.[12] Our decision in Munson SS. Co. v. Commissioner, supra,[13] depended upon the particular statute involved; we held that the encouragement to shipbuilding, which Congress had proffered to builders, was an overriding consideration, which should be recognized, regardless of the form employed.

It is true that Reed, J., also cited Higgins v. Smith[14] as an authority in Moline Properties, Inc. v. Commissioner, supra,[15] and it does not appear from the opinion in that case that the court thought that Higgins had organized the Innisfail Corporation only to escape taxation, or for any other purpose which put it outside the fair intendment of the word. Certainly, we had not thought so, when the case was before us. The decision may therefore make it possible for the Treasury at times to disregard transactions between its shareholders and his corporation even though it be a "corporation" in the sense we mean, although it must be confessed that the differentia is left open. We read that decision more broadly in United States v. Morris & Essex R. Co.,[16] but it does not follow that we should not be equally wrong to circumscribe it. Be that as it may, the taxpayers at bar can take no comfort from Higgins v. Smith, supra,[14] for, even though it may not be a critical test that the shareholder has created the corporation to conduct some lawful business, it does not thereafter rest with him to assert that it is a screen, when he has used it as a convenient method of actually conducting his business. If this be right, the assessments were valid. "Airco" found it more convenient in its manfacture and distribution to adopt a quadripartite form than to deal directly with third persons itself. Whatever its reasons, they were business reasons, and the corporations it used were "corporations" within any interpretation of the law. That is enough; it must accept the consequences of that choice; and it is not material that it retained the direction of their affairs down to the minutest detail, that it provided them with their assets, that it stood back of their liabilities and took all their profits. Even though Southern Pacific Co. v. Lowe, supra,[17] set up a different test, we regard it as pro tanto no longer controlling.

█ There remains only the vexed question whether we should yield our own judgment to that of the Tax Court.[18] The facts are not in dispute, for the argument is plainly untenable that the Tax Court's declaration that the income from the three businesses "was the income and property of Airco as principal," was a finding of fact; on the contrary, that was exactly the issue on which the whole case turned. Moreover, the Tax Court's decision was altogether based upon an interpretation of the decisions of the Supreme Court, and of the circuit courts of appeal, especially upon Munson SS. Co. v. Commissioner, supra.[19] Concededly, it is impossible to lay down any general principle to distinguish those situations in which a "clear-cut question of law" arises; and even more so to distinguish those in which we should treat the Tax Court's general familiarity with the subject-matter as conferring upon its decisions greater immunity from review than the decisions of other courts. We cannot believe, however, that even such specialists as the judges of that court are to be deemed in a better position to interpret the meaning of novices than the novices themselves: rather the opposite. Yet what this appeal in the end comes down to is whether "lay judges"—so to say—shall determine the meaning of other "lay judges" without weighting the scales in favor of an earlier decision of "expert judges." If they are not free to do so, we find it

---

[12] Paymer v. Commissioner, supra, 2 Cir., 150 F.2d 334, 337.

[13] 2 Cir., 77 F.2d 849.

[14] 308 U.S. 473, 60 S.Ct. 355, 84 L. Ed. 406.

[15] 319 U.S. 436, 63 S.Ct. 1132, 87 L. Ed. 1499.

[16] 2 Cir., 135 F.2d 711, 713.

[17] 247 U.S. 330, 38 S.Ct. 540, 62 L.Ed. 1142.

[18] Dobson v. Commissioner, 320 U.S. 489, 64 S.Ct. 239, 88 L.Ed. 248.

[19] 2 Cir., 77 F.2d 849.

hard to imagine a case in which they ever could be.[20]

Orders reversed; the assessments reinstated.

---

[20] Trust of Bingham v. Commissioner, 325 U.S. 365, 65 S.Ct. 1232, 89 L.Ed. 1670; Commissioner v. Wilcox, 327 U. S. 404, 66 S.Ct. 546, 90 L.Ed. 752, 166 A.L.R. 884; Crane v. Commissioner, 331 U.S. 1, 67 S.Ct. 1047.