## RAILWAY EXPRESS AGENCY, Inc. v. COMMISSIONER OF INTERNAL REVENUE.

## COMMISSIONER OF INTERNAL REVENUE v. RAILWAY EXPRESS AGENCY, Inc.

### No. 186, Docket 20793.

Circuit Court of Appeals.

Second Circuit.

July 19, 1948.

L. HAND, Circuit Judge, dissenting in part.

———◆———

Floyd F. Toomey, of Washington, D. C. (Ellsworth C. Alvord and John P. Lipscomb, Jr., both of Washington, D. C., on the brief), for petitioner, Railway Express Agency, Inc.

Abbott M. Sellers, Sp. Asst. to Atty. Gen. (Theron Lamar Caudle, Asst. Atty. Gen., and Sewall Key and A. F. Prescott, Sp. Assts. to Atty. Gen., on the brief), for respondent, Commissioner of Internal Revenue.

Before L. HAND, SWAN, and CLARK, Circuit Judges.

CLARK, Circuit. Judge.

These petitions for review, one brought by Railway Express Agency, Incorporated, and the other by the Commissioner of Internal Revenue, involve income and excess profits taxes for the years 1937 and 1938. Deficiencies in these taxes were originally determined by the Commissioner, but the Tax Court in a reasoned opinion, 8 T.C. 991, redetermined them at a lower figure, finding deficiencies in the income taxes of $49,384.08 and $39,509.44, and in the excess profits taxes of $47,579.28 and $28,-356.05 for the years in question. The action by the Commissioner was taken in consequence of his ruling that the Agency in its returns had deducted excess amounts for depreciation, but the Agency after notice of the deficiency assessments then concluded that it had been in error in returning its income as a taxpayer and that in fact it was a mere agent for the railroads it served. Its petition for review hence brings before us the adverse decision of the Tax Court on this issue; since the parties are now agreed as to the amount by which the depreciation deductions, if material, shall be reduced, the original point of division has become submerged in the broader question as to the status, taxwise, of this corporation. The Commissioner's petition is directed to that part of the decision of the Tax Court which allows the Agency credit for undistributed profits in computing the surtax thereon for the year 1937 on the ground that distribution is prohibited by contract within the meaning of § 26(c) (1) of the Revenue Act of 1936, 26 U.S.C.A.Int.Rev.Acts, page 836.

The facts, most of which were stipulated, are set forth in detail in Judge Disney's opinion, 8 T.C. 991, and we shall repeat here only those most material. The organization of this corporation by the railroads of the country took place in 1928 and 1929. Prior to that time a nationwide express service had been performed under uniform contracts with the railroads by the American Railway Express Company, an independent company formed as a result of the suggestion of the Federal Director General of Railroads in World War I for the organization of a single express service in place of the several theretofore existing. The uniform contracts with this company were to expire on February 28, 1929. During the period of operation un-

der the contracts a committee of the Association of Railway Executives—the Uniform Express Contract Committee—represented the common interests of the railroads and prepared a detailed plan for the carrying on of the express business after the termination of these contractual relations. The plan as ultimately adopted provided for the organization of a new express company by the 86 named railroads which carried approximately 98 per cent of the gross express business on all railroads. The petitioner Railway Express Agency, Incorporated, is the product of this plan and was organized in Delaware pursuant thereto. It had an authorized capital stock of 1,000 shares without par value. The certificate of incorporation placed certain restrictions on the transfer of its stock which was allotted to these 86 railroads, on the basis of the express business done by them in the past, at a price of $100 a share. Subsequently, by reason of various changes, such as mergers and consolidations of some of its stockholders, the number of stockholders by September, 1938, had been reduced to 70 railroad companies, a number which has since remained constant.

The Agency has operated its express business under separate identical contracts with substantially all of the railroad companies in the United States. During the tax years in controversy over 400 railroads, including those which were stockholders, were parties with the Agency to such Express Operations Agreements. These agreements are effective to February 28, 1954. Each designated the Agency as the exclusive agent of the railroad for the conduct of the express transportation business and for the collection and disbursement and division of all revenue collected under the agreement. The Agency was, however, authorized to file tariffs and other rules and regulations with the Interstate Commerce Commission on its own behalf or on behalf of the railroads. Moreover, as between the Agency and the railroads, the former was liable for loss to its own property and for injury to its own employees and agents. Nothing in the agreement limited the right of the Agency to appoint and exercise control over its employees.

Provision was made for the arbitration of disputes on request, resort to such arbitration being a condition precedent to any further action.

The terms of the agreements fixed the amounts payable to the contracting railroads as, in short, gross revenue less expenses. The agreements contemplated that all income and expenses, as defined therein, including depreciation, should be taken into account in arriving at the amount distributable to the railroads, each of which was to receive a proportionate share according to the amount of express business it had handled on its line. The allowed deductions were particularized. Thus the Agency was authorized to deduct from the moneys received by it certain items that were designated net income items, including appropriations from "net income" for investment in physical property. So, too, certain "surplus" items could be deducted; and comprehended within that category was "surplus set aside for investment in physical property."

In order to obtain funds for the purchase of the property of the American Railway Express Company the Agency had issued $32,000,000 of 5 per cent bonds under a trust indenture, wherein the Guaranty Trust Company of New York was trustee; and these bonds were sold to underwriters, who sold them to the public. The rights of the Agency under the Express Operations Agreements were pledged in the trust indenture as security for the payment of the bonds and interest thereon, as to which the Agency was solely liable. The indenture further provided that the Agency would not mortgage or pledge its rights under the agreements except in subordination to the lien of the instrument. The indenture made all indebtedness of the Agency subordinate to the bonds issued or to be issued thereunder. It contained an agreement on the part of the Agency not to modify the agreements with the railroads without the written consent of the trustee, as well as provisions for semiannual payments out of the rail transportation revenue into a sinking fund and, in case of default by the obligor, for operation or sale of the property for the benefit of the bondholders.

196

During 1937 and 1938, in determining rail transportation revenue, the Agency deducted from its income those charges and items of expense which were provided for in its agreements with the railroads. Included therein were deductions for depreciations of $2,308,642.09 and $2,136,209.41 respectively, computed in the manner and at the rates as ordered by the Interstate Commerce Commission. The balance it distributed among the railroads with which it had agreements. These depreciation allowances were claimed as deductions in its returns for 1937 and 1938 and were the occasion for the deficiency assessments referred to above. As now stipulated by the parties, the correct disallowance from each item is $383,994.07 and $259,305.31 respectively. In 1945 the Interstate Commerce Commission granted the Agency permission, retroactively to January 1, 1937, to account for depreciation charges on the basis found by the Bureau of Internal Revenue; but the Agency has as yet taken no action upon this permission in view of the pendency of these proceedings.

On this appeal the Agency takes the position that it is a creature of the railroads and, as such, acts as their agent in conducting, under uniform contracts, an express transportation business over their lines. It asserts that it was not the beneficial owner of any of the amounts it received, including those which it did not in fact distribute to the railroads during the years in issue. The argument is made that under the Express Operations Agreements it was accountable to the railroads for all its revenues, and, accordingly, that the income attributable to it by reason of the disallowance of deductions for depreciation is taxable to the railroads. As opposed to this, the Commissioner argues that the Agency had a real surplus by at least the amount of depreciation charged in excess of the amounts actually sustained, and that it should be regarded like other corporations and subject to income tax liability therefor.

In the recently decided case of C. I. R. v. National Carbide Corporation, 2 Cir., 167 F.2d 304, this court held squarely to the contrary of the position taken by the Agency. There certain orders of the Tax Court, en banc, were reversed, and it was held that a wholly owned subsidiary of a parent corporation should be treated for purposes of income taxation as a separate taxable person. It mattered not that the parent adopted the corporate form to deal with third persons because it found it more convenient to do so. Indeed, whatever the reasons, they were business reasons, "and the corporations it used were 'corporations' within any interpretation of the law. That is enough; it must accept the consequences of that choice; and it is not material that it retained the direction of their affairs down to the minutest detail, that it provided them with their assets, that it stood back of their liabilities and took all their profits." 167 F.2d at page 307. So, too, it should be noted that there the subsidiaries were employed by the parent company as its agents. Applying the principles stated in that case to the situation before us, it is clear that the Agency was properly taxed. It had issued $32,000,000 in bonds to acquire the extensive properties of the American Railway Express Company. It was engaged in a nationwide business of enormous proportions. Even if it were true that the railroads ultimately would be the only losers or gainers, that alone would not be decisive in determining its tax liability. For the parent company is usually the ultimate beneficiary, the subsidiary a means to further its ends. But, as the National Carbide case, supra, shows, if the corporate device is used for business advantages, there is no just ground for protest when it results in tax liability. See also Moline Properties, Inc. v. C. I. R., 319 U. S. 436, 63 S.Ct. 1132, 87 L.Ed. 1499, and the other cases there cited and discussed.

As a matter of fact this case seems yet more clearly against this taxpayer than did that, as the Tax Court demonstrated in its opinion below. For that court's decision in the National Carbide case, 8 T.C. 594, had not been reversed by us at the time Judge Disney wrote herein. And so he pointed out that the taxpayer here was no mere department of another organization such as were the subsidiaries of the parent company in the National Carbide case. He then went on to point out with

painstaking care the indicia demonstrating that the Agency was not a mere creature of the railroads as it had contended. No purpose will be served in repeating his reasoning in full; we shall refer only to some of the salient factors which lead to this conclusion.

Thus the Agency, and not the railroads, was liable for loss to its own property or the property that was carried. So, too, it was liable for the injury to its own employees and agents. Nothing in the agreements limited its right to appoint and exercise control over its employees and agents. Numerous provisions of the agreements provided for the settlement of disputes between it and the contracting parties. Arbitration was a condition precedent to further action. Seemingly the only further action contemplated was a resort to the courts—with the Agency as a definite party.

Again, the property used by the Agency in carrying out its activities was owned by it, and the contracting railroads had no interest therein. The Agency had issued $32,000,000 of bonds, and only it was liable thereon. Its default empowered the trustee to take possession of the properties and operate them to pay off the bonds. So the agreements gave the Agency the right to treat accounts for the investment in physical property and for "surplus set aside for investment in physical property" as expense deductions. These provisions would enable the Agency, if it so decided, to increase its physical properties out of funds which would otherwise be distributable to the contracting railroads. Moreover, most of the bond issue had been expended upon property and such property belonged solely to the Agency, which was the obligor of the bonds.

It follows that the depreciation items were deducted by the Agency for its own benefit as the owner of depreciating property. To the extent that the depreciation exceeded that allowed for tax purposes it represented income of the Agency upon which the latter was liable for taxes. We conclude, therefore, that the Tax Court was amply justified in upholding deficiency assessments against the Agency. This disposes of the taxpayer's petition for review.

Upon the Commissioner's petition, we must determine whether, for 1937, the Agency was entitled to the credit granted by § 26(c) (1) of the Revenue Act of 1936 in computing its surtax—imposed by § 14 of that Act, 26 U.S.C.A.Int.Rev.Acts, page 823—upon undistributed net income. Sec. 26(c) (1) allows a credit of any sums which cannot be distributed as dividends "without violating a provision of a written contract executed by the corporation prior to May 1, 1936, which provision expressly deals with the payment of dividends." The Agency contends, and the Tax Court agreed, that the Express Operations Agreements constituted contracts prohibiting the payment of dividends. In support of this it argues that the agreements carefully detailed the allowable deductions and expressly excluded a deduction for dividend appropriations of income. Furthermore, it says that under the system of accounting imposed on it by the terms of the agreements there was no income at the end of each year out of which transfer to surplus could be made. The argument continues that it cannot deduct dividend appropriations from income and that, since it must account to the railroads for all its income, then the prohibition is all-inclusive. Finally, it urges that the intention of the railroads was clear and to the effect that no dividends should be paid the stockholders.

■ There is a considerable equity in the Agency's contention and the view taken below, since it does seem the intent of the railroads—made doubly clear by the later course of conduct—that dividends should not be paid. Had the parties been able to forecast the future statutory provision, they would undoubtedly have drawn their agreements to reap the benefit of it. But the statutory grant of credit is clear and precise in its limitations; and, in common with other courts, we have construed it strictly according to its terms and required a definite showing that the prohibition was expressly stated in an executed contract. Helvering v. Northwest Steel Rolling Mills, 311 U.S. 46, 61 S.Ct. 109, 85 L.Ed. 29; Helvering v. Ohio Leather Co., 317 U.S. 102, 63 S.Ct. 103, 87 L.Ed. 113; Bates Valve Bag Corporation v. Higgins, 2 Cir.,

157 F.2d 886; Van Ameringen-Haebler, Inc., v. Helvering, 2 Cir., 132 F.2d 855; Buffalo Slag Co. v. C. I. R., 2 Cir., 131 F. 2d 625; Metal Specialty Co. v. C. I. R., 6 Cir., 128 F.2d 259. Here that requirement is wanting. The terms of the agreements were detailed. The Agency had to account to the railroads for the entire gross revenues accruing under the contract, though certain charges and items of expense might be deducted. These allowable deductions, set forth in another document incorporated by reference, appeared in five specified categories, the last of which is entitled "Other Deductions." This enumerates several items, but specifically excepts therefrom "Dividend Appropriations of Income." The first of the five categories allows deductions for operating expenses, including depreciation, and the income here in issue was deducted under that provision. There is no contention that the deduction when made in any way offended its terms. As far as the Express Operations Agreement is concerned, the deduction is proper. It was not made for the purpose of paying dividends, and accordingly the exception specified is not relevant. For only if an attempt were made to deduct a sum for that purpose would there be any question of a breach of the agreement. Only then would the stated exception come into play.

We come then to this, that the provision relied upon by the Agency is one that does not prohibit the payment of dividends, but merely forbids the deduction of dividend appropriations in the accounting made by the Agency to the railroads. So long as the deductions taken are properly allowable, the railroads have no just cause of complaint. For they are entitled only to the balance remaining after the allowed deductions are taken from the listed items of gross revenue. Here the railroads, by the terms of the agreements, allowed the Agency to take depreciation deductions in excess of what was actually needed or allowed for tax purposes. By so doing the Agency gained a windfall to that extent. As far as the agreements themselves were concerned, there is nothing preventing the Agency from using this in the payment of dividends or for any other purpose it deems proper.

Hence arguments of hardship, or what the parties intended, will not suffice. The taxpayer claiming the credit must show that he comes within its exact terms. This taxpayer cannot make such a showing and is not entitled to the statutory credit. The Commissioner's petition for review must therefore be sustained, and the tax for the year 1937 increased as he contends.

Accordingly the decision of the Tax Court is affirmed so far as it is attacked by the petition of Railway Express Agency, Incorporated, but is reversed upon the petition of the Commissioner of Internal Revenue.

L. HAND, Circuit Judge (dissenting in part).

Article V, § 4(i), of the Express Operations Agreement provides that, in stating its accounts with the railroads, the Agency may include among its credits the deductions of "Caption IV" except item 329. This refers to a document of the Interstate Commerce Commission, issued in 1914, long before the Agency was created; and "Caption IV" was in five sections, of which item 329 was dividends "declared payable." Therefore, Article V, § 4(i), means that, if the Agency paid a dividend to the roads, which were its only shareholders, it could not deduct it in accounting with them, but would have to pay it to them again. As my brothers say, the Agreement required the Agency to pay over all its net income to the roads; but, so strict has been the interpretation of the section, and so specific are its terms, that I should agree that more was necessary to bring the case within the exemption than our conclusion that net income must have been meant to exclude dividends; some provision was necessary which "expressly deals with the payment of dividends," and any such payment must "violate" that provision.

I cannot see how we can avoid concluding that Article V, § 4(i), "expressly deals with the payment of dividends"; certainly it must be enough that by reference it expressly excludes item 329 of "Caption IV." Hence the question becomes whether any "payment of dividends" would "violate" Article V, § 4(i), after "Caption IV"—

less item 329—has been read into it. It is true that verbally it is not Article V, § 4(i), which such a payment would "violate," but the general requirement that the Agency must pay over all net income. However, in order to learn what that income is, we must have recourse to Article V, § 4(i), expanded as I have just said. To say therefore that such a payment would not "violate" the provision which "expressly deals with the payment of dividends" seems to me to be nothing less than to refuse to allow the Express Operations Agreement to be read as a whole, after all has been incorporated into it that by reference it has incorporated. I do not believe that the section meant to deny to taxpayers such a fundamental canon of documentary interpretation.