[L.A. No. 30268. In Bank. Dec. 10, 1974.]

NO OIL, INC., et al., Plaintiffs and Appellants, v.
CITY OF LOS ANGELES et al., Defendants and Respondents.

## COUNSEL

Brent N. Rushforth, Carlyle W. Hall, Jr., Mary D. Nichols, John R. Phillips, A. Thomas Hunt and Frederic P. Sutherland for Plaintiffs and Appellants.

Evelle J. Younger, Attorney General, Robert H. O'Brien, Assistant Attorney General, Nicholas C. Yost and Jan E. Chatten, Deputy Attorneys General, as Amici Curiae on behalf of Plaintiffs and Appellants.

Lawler, Felix & Hall, Robert Henigson, William K. Dial, Hanna & Morton, Harold C. Morton, Edward S. Renwick, Bela G. Lugosi, Mitchell, Silberberg & Knupp and Arthur Groman for Defendants and Respondents.

Hindin, McKay, Levine & Glick and Denis A. Glick as Amici Curiae on behalf of Defendants and Respondents.

## OPINION

**TOBRINER, J.**—Plaintiffs appeal from a judgment of the Los Angeles Superior Court ruling that the City of Los Angeles need not prepare an environmental impact report (EIR) before enacting ordinances to permit defendant Occidental Petroleum Corp. to sink two test oil wells in the Pacific Palisades region of the city. This appeal, the first case arising under the California Environmental Quality Act (hereafter CEQA) (Pub. Resources Code, § 21050 et seq.) to reach this court since *Friends of Mammoth* v. *Board of Supervisors* (1972) 8 Cal.3d 247 [104 Cal.Rptr. 761, 502 P.2d 1049], compels us to inquire into how an agency should decide whether a pending project requires an EIR.[1]

---

[1]For a summary of the relationship between CEQA as enacted in 1970, *Friends of Mammoth,* and the 1972 amended act, see Seneker, *The Legislative Response to Friends of Mammoth—Developers Chase the Will-O'-The-Wisp* (1973) 48 State Bar J. 127.

In CEQA, the Legislature sought to protect the environment by the establishment of administrative procedures drafted to "Ensure that the long-term protection of the environment shall be the guiding criterion in public decisions." (Pub. Resources Code, § 21001, subd. (d).) To achieve these objectives, CEQA and the guidelines issued by the State Resources Agency to implement CEQA[2] establish a three-tiered structure. If a project falls within a category exempt by administrative regulation (see Pub. Resources Code, §§ 21084, 21085), or "it can be seen with certainty that the activity in question will not have a significant effect on the environment" (Cal. Admin. Code, tit. 14, § 15060), no further agency evaluation is required. If there is a possibility that the project may have a significant effect, the agency undertakes an initial threshold study (Cal. Admin. Code, tit. 14, § 15080); if that study demonstrates that the project "will not have a significant effect," the agency may so declare in a brief Negative Declaration. (Cal. Admin. Code, tit. 14, § 15083.) If the project is one "which may have a significant effect on the environment," an EIR is required. (Pub. Resources Code, §§ 21100, 21151; see Cal. Admin. Code, tit. 14, § 15080.) The parties assume that the drilling project is one which may possibly have a significant effect and thus requires an initial threshold environmental study. The question is whether the city properly determined that no EIR was necessary.

■ Judicial review of the city's decision is governed by Public Resources Code section 21168.5, which provides that "In any action or proceeding, other than an action or proceeding under Section 21168, to attack, review, set aside, void or annul a determination or decision of a public agency on the grounds of noncompliance with this division, the inquiry shall extend only to whether there was a prejudicial abuse of discretion. Abuse of discretion is established if the agency has not proceeded in a manner required by law or if the determination or decision is not supported by substantial evidence."[3] Since, as we shall explain, the judgment

---

[2]The guidelines established by the State Resources Agency took effect on February 10, 1973, shortly after completion of the trial in the present case. We do not apply these guidelines retroactively to decisions of the court or city council rendered before the guidelines went into effect. We make use of the guidelines, however, as a suggested interpretation of the statute, and as an illustration of the procedures which the resources agency finds necessary to enforcement of the statute.

[3]Judicial review of agency action under CEQA is governed by sections 21168 and 21168.5. Section 21168 provides that review of an agency decision "made as a result of a proceeding in which by law a hearing is required to be given, evidence is required to be taken and discretion in the determination of facts is vested in a public agency" should follow the administrative mandamus procedure of Code of Civil Procedure section 1094.5. Section 21168.5, quoted in the text, provides that other agency decisions should be reviewed by a traditional mandamus action. Since the

of the superior court sustaining the city's decision must be reversed because of the city's failure to proceed in the manner required by law, we do not reach the question whether that decision is supported by substantial evidence.

The city council specifically failed to comply with the requirements of CEQA in two respects. First, because an EIR serves to guide an agency in deciding whether to approve or disapprove a proposed project, CEQA impliedly requires (and the guidelines expressly require) that the agency render a written determination whether a project requires an EIR before it gives final approval to that project. The city council, however, approved the drilling project in October of 1972 without a written determination concerning the environmental impact of that project. The belated council resolution in January of 1973, despite its attempt to render a determination retroactively as of the previous October, does not suffice to comply with the requirement that environmental issues be considered and resolved before a project is approved.

Second, since the preparation of an EIR is the key to environmental protection under CEQA, accomplishment of the high objectives of that act requires the preparation of an EIR whenever it can be fairly argued on the basis of substantial evidence that the project may have significant environmental impact. The superior court in the present case, however, ordered the city council to follow a far more restrictive test that limited use of an EIR to projects which may have an "important" or "momentous" effect of semi-permanent duration. The superior court's instruction, in addition, overlooked the importance of preparing an EIR in cases, such as the present action, in which the determination of a project's environmental effect turns upon the resolution of controverted issues of fact and forms the subject of intense public concern. In the context of this case, we shall point out the bases for our conclusion that the city's use of the erroneous test stated by the trial court constitutes a prejudicial abuse of discretion.

---

Los Angeles City Council was not required by law to hold an evidentiary hearing before approving the ordinances establishing the oil drilling districts, section 21168.5 governs the case at bar.

Sections 21168 and 21168.5 became effective on December 5, 1972—subsequent to the October city council hearings and to the filing of this action, but before the trial in the superior court and that court's remand of the matter to the city council. Fortunately the Legislature, anticipating that issues might arise concerning the retro-activity of these sections, enacted that "Sections 21168 and 21168.5 are declaratory of existing law with respect to the judicial review of determinations or decisions of public agencies made pursuant to this division." (Pub. Resources Code, § 21168.7.) This enactment demonstrates that the Legislature intends sections 21168 and 21168.5 to apply to all proceedings under CEQA, including those pending when those sections became effective.

1. *Chronology of events.*

In 1966 Occidental Petroleum drilled the Marquez Core Hole in Santa Monica Canyon and discovered oil producing sands at a depth of 9,200 feet. Seeking to determine the extent of the oil field, Occidental acquired the "highway drillsite" in Pacifiic Palisades in 1969. This two-acre site lies across a state highway from Will Rogers State Beach and near the foot of a bluff which has experienced numerous landslides.

In July of 1970, the Office of Zoning Administration of the City of Los Angeles granted Occidental a conditional use permit allowing it to drill a test well at the highway drillsite. The board of zoning appeals overturned that decision, finding that the drilling might trigger a disastrous landslide, that a blowout—an uncontrolled effusion of oil under pressure—would have severe environmental consequences, and that an industrial use of the site would be aesthetically undesirable.

Seeking to circumvent the requirement for a conditional use permit, Occidental petitioned the city in 1972 to establish three oil drilling districts in the Pacific Palisades. Since the oil drilling districts proposed by Occidental would have permitted commercial oil production, the hearing examiner for the city planning commission, concerned about the environmental impact of such production, recommended disapproval of the proposal. Nevertheless the planning commission resolved to approve the proposal on condition that only two test holes be drilled.

On October 10, 1972, the council considered three ordinances which established oil drilling districts in the Pacific Palisades area, subject to the condition that only two test wells could be drilled. At the close of the hearing Councilman Wachs inquired whether the city attorney had examined the proposed ordinances in the light of our opinion in *Friends of Mammoth* filed three weeks earlier. The city attorney replied that since the city had not yet established procedures to ascertain the environmental impact of measures coming before the council, he had made no such examination.

At the next meeting, on October 17, Councilman Wachs moved to postpone consideration of the ordinances pending preparation of an EIR. No other councilman discussed the motion, which failed by an eight-to-six vote. The council then passed the ordinances by the same eight-to-six vote. Mayor Yorty signed the ordinances into law on October 20.

Plaintiffs, four nonprofit corporations representing persons opposed to oil drilling in Pacific Palisades, filed the instant action on October 27. Their complaint sought a declaration that the ordinances were invalid,

prayed for mandate to compel preparation of an EIR, and requested an injunction against the issuance of a drilling permit by the office of zoning administration.[4] The city, in response, contended that no EIR was necessary, supporting this contention with declarations from the eight councilmen who voted for the ordinances; each declared, in the statutory language, his opinion that the drilling project was not such as might have a significant effect on the environment. Occidental, on the other hand, maintained that the reports of the planning commission constituted a sufficient EIR.

Plaintiffs initially claimed that the "project" whose impact was at issue encompassed commercial oil production in Pacific Palisades; they argued that it was evident such production would have a significant effect on the environment. The trial court, however, limited the issue to the impact of the drilling of the test wells.[5] Plaintiffs presented expert testimony

---

[4]Before beginning to drill, Occidental was required to secure drilling permits from the office of zoning administration. The office expressly found that issuance of the drilling permits would not require an EIR, and issued the requested permits on January 4, 1973. The board of zoning appeals upheld that decision on January 31, and Occidental commenced drilling operations the same day. We issued a stay order halting the drilling on February 7.

[5]Plaintiffs contend that the trial court erred in limiting the scope of the "project" at issue to the drilling of two test wells; they maintain that the scope of inquiry should include the environmental effects of commercial production and exploitation of the oil resources of the Pacific Palisades. They point out that the drilling of the test wells would be a useless waste of money unless commercial production can follow. Thus information on the environmental impact of commercial production is relevant to the council's decision to approve the test wells; if that data proved that commercial production would be harmful, the council might well decide to disapprove the test drilling. Under these circumstances, plaintiffs observe that a narrow definition of "project" which bars inquiry into the environmental effects of commercial production defeats the objectives of the act.

Defendants protest, however, that the geologic information obtained from the test wells is essential to the preparation of an accurate EIR on the impact of commercial production. As the court pointed out in *Scientists' Inst. for Pub. Info., Inc.* v. *Atomic Energy Com'n* (1973) 481 F.2d 1079 [156 App.D.C. 395], an impact statement prepared before reliable information is available would "tend toward uninformative generalities" (481 F.2d at p. 1093), but one delayed until after key decisions have been made could not assure that such decisions reflected environmental consideration. "Thus we are pulled in two directions. Statements must be written late enough in the development process to contain meaningful information, but they must be written early enough so that whatever information is contained can practically serve as an input into the decision making process." (481 F.2d at p. 1094.)

The issue thus narrows to the question whether the city, before drilling of the test wells, has sufficient reliable data to permit preparation of a meaningful and accurate report on the impact of commercial production. Unfortunately the parties have not briefed this question thoroughly, and the record contains little evidence pertinent to its resolution. Since we are persuaded by plaintiffs' other contentions to reverse the judgment against them, we need not and do not decide whether the trial court erred in limiting the scope of inquiry to exclude consideration of commercial production.

to show that even this limited "project" might have a significant environmental effect. Paul Witherspoon, a professor of petroleum geology at the University of California at Berkeley, explained that a blowout, an unavoidable hazard of exploratory drilling, might lead to oil seepage polluting the adjoining state beach and harbor. George Tauxe, a professor of soil mechanics at U.C.L.A., testified that the drilling site was located at the foot of an unstable bluff, a locale of past landslides. Plaintiffs also contend that the drilling operation would be noisy and visually unattractive.

In rebuttal, Occidental presented testimony by Ted Bear, a consulting petroleum geologist, that absent human or mechanical failure, there was no danger of a blowout at the highway drillsite. Other geologists employed by Occidental described measures planned to contain a blowout. David Leeds, a consulting seismologist, testified that the drilling vibrations perceived at the base of the bluff would be of lesser magnitude than those caused by existing traffic on the highway west of the drillsite, and even less than the ambient vibrations in the vicinity of the courtroom. Occidental also presented photographs to show that a drillsite could be constructed to avoid visual blight.

On December 29, 1972, the judge announced an oral ruling. Declaring that the council's actions of October 10 and 17 were equivocal, he resolved to remand the matter to the council for clarification of the council's position on the question: "Is the present Occidental application to drill two core holes such a project that may have a significant effect on the environment?"

In remanding the matter, the court stated a test for use by the council in determining whether a project "may have a significant effect on the environment": "whether there is a reasonable possibility that the project will have a momentous or important effect of a permanent or long enduring nature."

The council convened on January 8, 1973. At the conclusion of the hearing the council, by an eight-to-seven vote, adopted a resolution stating that "the Los Angeles City Council specifically declare that at the time it adopted the subject three ordinances it believed, and now specifically finds, that such ordinances and the restricted activities permitted thereby would have no significant effect on the environment."

▇▇▇ ▇ ▇ The superior court found that the council's adoption of this resolution was supported by substantial evidence in the administrative

record both as of October 1972, and as of January 8, 1973.[6] It then entered judgment declaring that the council lawfully determined that no EIR was required for the drilling project, and denying plaintiffs' request for mandate and injunctive relief.

Plaintiffs appealed and unsuccessfully sought a stay order from the Court of Appeal.[7] Since the appeal presented issues of public importance, which would be mooted if Occidental completed the drilling project pending appeal, we ordered the cause transferred to this court, issued a stay order and returned the cause to the Court of Appeal. (See *People* ex rel. *S.F. Bay etc. Com.* v. *Town of Emeryville* (1968) 69 Cal.2d 533, 537 [72 Cal.Rptr. 790, 446 P.2d 790].) The action is now here on petition for hearing from the Court of Appeal decision.

2. *The Council erroneously failed to render a written determination respecting the environmental effect of the drilling project* before *it approved that project.*

■ As the superior court recognized, CEQA requires that an agency determine whether a project may have a significant environmental impact, and thus whether an EIR is required, *before* it approves that project.[8]

[6]In an action for administrative mandamus, the court reviews the administrative record, receiving additional evidence only if that evidence was unavailable at the time of the administrative hearing, or improperly excluded from the record. (Code Civ. Proc., § 1094.5.) In a traditional mandamus action, on the other hand, the court is not limited to review of the administrative record, but may receive additional evidence. (*Felt* v. *Waughop* (1924) 193 Cal. 498, 504 [225 P. 862]; *Lassen* v. *City of Alameda* (1957) 150 Cal.App.2d 44, 48 [309 P.2d 520]; Cal. Civil Writs (Cont. Ed.Bar 1970) § 17.9.) Hence the issue before the superior court in the present case was whether substantial evidence, on the whole record including the evidence presented to that court, supported the determination that no EIR was required. The superior court's finding—that the council's resolution was supported by substantial evidence "in the administrative record"—is not responsive to that issue.

[7]On January 15, 1973, the superior court entered a minute order denying plaintiffs' request for preliminary and final injunctions, declaratory relief, and mandamus. The order also denied plaintiffs' motion for stay of execution, and directed counsel for Occidental to prepare findings and judgment.

Plaintiffs appealed from that minute order and any ensuing judgment. Although the order did not constitute a final judgment on the merits, plaintiffs' appeal was timely both with respect to the denial of a preliminary injunction and the denial of stay of execution (see Code Civ. Proc., § 904.1; *Brydon* v. *City of Hermosa Beach* (1928) 93 Cal.App. 615, 620 [270 P. 255]). Final judgment has now been entered, rendering moot the denial of preliminary relief.

[8]See *Friends of Mammoth* v. *Board of Supervisors, supra,* 8 Cal.3d 247, 262. The statutory definition of an EIR requires that the report be considered before a project is approved (see Pub. Resources Code, § 21061), which necessarily implies that the decision whether or not to prepare a report must precede approval of the project. The CEQA guidelines expressly state that "The EIR process is intended to enable

Finding the council's action of October 17 ambiguous, the court remanded the matter to the council for clarification. The council passed a resolution stating that it believed, as of October 1972, that the drilling project was not such as might have a significant impact; the court accepted this resolution as constituting the requisite determination of environmental issues before approval of the project.

■ We conclude, however, that a determination that a project does not require an EIR, when that project is not exempt from environmental study under the act or guidelines,[9] must take the form of a written Negative Declaration. Such is the unanimous view of the federal courts construing the National Environmental Policy Act of 1969 (NEPA) (42 U.S.C. § 4321 et seq.),[10] and the explicit requirement of both federal and state guidelines. (See Council on Environmental Quality, Preparation of Environmental Impact Statements: Guidelines, § 1500.5, 38 Fed. Reg. 20552 (1973); Cal. Admin. Code, tit. 14, § 15083.)[11] Absent such a written de-

---

public agencies to evaluate a project to determine whether it may have a significant effect on the environment, to examine and institute methods of reducing adverse impacts, and to consider alternatives to the project as proposed. *These things must be done prior to approval or disapproval of the project.*" (Cal. Admin. Code, tit. 14, § 15012.) (Italics added.)

[9]Public Resources Code section 21085 provides that no environmental study is required if a project comes within a category exempt by administrative regulation; the Resource Agency guidelines list seven such categorical exemptions (Cal. Admin. Code, tit. 14, §§ 15101-15107). Guideline 15060 also provides generally that no environmental study is needed if "it can be seen with certainty that the activity in question will not have a significant effect on the environment."

[10]See, e.g., *Hanly* v. *Mitchell* (2d Cir. 1972) 460 F.2d 640; *Hanly* v. *Kleindienst* (2d Cir. 1972) 471 F.2d 823; cf. *Environmental Defense Fund, Inc.* v. *Ruckelshaus* (1971) 439 F.2d 584, 598 [142 App.D.C. 74].

[11]Guideline 15083 specifies that a Negative Declaration must include a brief description of the project, a finding that the project will not have a significant effect, and a statement of reasons to support that finding. The city maintains that since section 15083 did not take effect until February of 1973, its specifications should not be applied to the decision of the city council in October of 1972. The requirement that a finding of no significant impact take the form of an express written determination, however, is implicit in the act itself, and could have been deduced in October of 1972 from examination of the act, from our decision in *Friends of Mammoth* v. *Board of Supervisors, supra,* 8 Cal.3d 247, and from the federal cases cited in that decision.

Plaintiffs in turn assert that a Negative Declaration should go beyond the specifications of section 15083 and contain a full exposition of all relevant environmental factors; they contend that section 15083, which contemplates only a conclusory one-page document, is invalid under the terms of CEQA. Language in *Hixon* v. *County of Los Angeles* (1974) 38 Cal.App.3d 370, 380 [113 Cal.Rptr. 433] notwithstanding, plaintiffs' contention presents a justiciable issue. (See *Desert Environment Conservation Assn.* v. *Public Utilities Com.* (1973) 8 Cal.3d 739, 742-743 [106 Cal.Rptr. 31, 505 P.2d 223].) Its resolution, however, should await a case which arises after the effective date of the challenged regulation.

termination, there is no way a court can determine whether agency silence represents a decision that a project does not require an EIR or a failure to decide that issue.

We do not question the power of a trial court to remand a matter to an administrative agency for clarification of ambiguous findings. (See *Keeler* v. *Superior Court* (1956) 46 Cal.2d 596, 600 [297 P.2d 967].) This doctrine, however, does not apply to the present case. This is not a case in which an agency rendered ambiguous findings concerning the environmental effect of the project, but a case of total absence of any written determination on the matter; for all the record reveals, the council may have simply ignored CEQA and enacted the ordinances in the same manner to which it was accustomed before CEQA was enacted.[12]

At the time of the January 8, 1973, resolution, the council had already approved the project. No resolution adopted on that date can constitute that determination of environmental impact prior to approval of the project which the act requires. The resolution adopted at that meeting represents simply an example of that "*post hoc* rationalization" of a decision already made, which the courts condemned in *Citizens to Preserve Overton Park* v. *Volpe* (1971) 401 U.S. 402, 420 [28 L.Ed.2d 136, 155, 91 S.Ct. 814] and *Environmental Defense Fund, Inc.* v. *Coastside County Water Dist.* (1972) 27 Cal.App.3d 695, 706 [104 Cal.Rptr. 197].

In failing to render a written determination of environmental impact before approving the project, the council proceeded in a manner contrary to the requirements of law. (See Pub. Resources Code, § 21168.5.) This failure cannot be excused on the theory that the council might have approved the drilling project anyway; "[t]o permit an agency to ignore its duties . . . with impunity because we have serious doubts that its ultimate decision will be affected by compliance would subvert the very purpose of the Act." (*City of New York* v. *United States* (E.D.N.Y. 1972) 337 F.Supp. 150, 160 [NEPA]; *Arizona Public Service Co.* v. *Federal Power Com'n* (1973) 483 F.2d 1275, 1283 [157 App.D.C. 272]; see *Jones* v. *District of Columbia Redevelopment Land Agency* (D.C. Cir. 1974) 499 F.2d 502, 512-513.)

---

[12]Neither CEQA nor Code of Civil Procedure section 1094.5 require rendition of findings of fact in quasi-legislative proceedings; our opinion imposes no such requirement. We hold only that when the agency makes a determination whether a project requires an EIR, as CEQA requires it to do, it should put that determination in writing.

3. *The city council followed an erroneous test in deciding that the drilling project did not require an environmental impact report.*

As we have explained, the council's resolution of January 8, 1973, cannot be given retroactive effect to validate the council's actions of the previous October. ■■■ We now point out that the council's resolution is defective on a second ground, namely, that the council employed incorrect standards in determining that the drilling project did not require an EIR.

Public Resources Code section 21151, as of October 1972, provided that local government agencies not having an officially adopted conservation element of a general plan (such as the City of Los Angeles) "shall make an environmental impact report on any *project* they intend to carry out *which may have a significant effect on the environment.*" (Italics added.) Although section 21151 was amended effective December 5, 1972,[13] the italicized words, the focus of the present controversy, are identical in both the original and amended sections.[14]

The trial court, on remanding this cause to the city council for clarification, interpreted this section to compel preparation of an EIR only when "there is a reasonable possibility that the project will have a momentous or important effect of a permanent or long enduring nature." As we shall explain, this test sets far too high a barrier to the preparation of an EIR.[15]

---

[13]Section 21151 now provides that "All local agencies shall prepare, or cause to be prepared by contract, and certify the completion of an environmental impact report on any project they intend to carry out or approve which may have a significant effect on the environment. . . ." The amendment authorized agencies to contract for preparation of an EIR instead of preparing it themselves, added the requirement for an EIR when the agency approves a private project (thus codifying the holding in *Friends of Mammoth* v. *Board of Supervisors, supra,* 8 Cal.3d 247) and eliminated the exemption for cities with an officially adopted conservation element in their general plan.

[14]The defendants concede that the test wells constitute a "project" as defined in Public Resources Code section 21065, and that the enactment of the ordinances establishing oil drilling districts constitutes the carrying out of such a project within the terms of section 21151. Plaintiffs maintain that the scope of the "project" whose impact is at issue encompasses not only the drilling of the test wells but also the possibility of subsequent commercial production. (See fn. 5, *supra.*)

[15]We do not think this court at this time should draft a substitute test. The responsibility for formulation of such a test is expressly delegated by CEQA to the State Resources Agency. (See Pub. Resources Code, § 21083.) That agency has defined "significant effect" as "a substantial adverse impact on the environment" (Cal. Admin. Code, tit. 14, § 15040)—a definition which differs markedly from that advanced by the trial court—and listed those environmental consequences which ordinarily indicate that a project may have a significant effect. (Cal. Admin. Code, tit. 14, § 15081.)

The Attorney General, as amicus curiae, stated his opposition to the guidelines' definition of "significant effect" on the ground that agency action may significantly

CEQA requires an EIR only for projects whose environmental effect can be described as "significant."

This key word, however, is not a term of precision but encompasses a range of meaning.[16] It cannot be adequately defined by a random selection of synonyms from a thesaurus. Facing a spectrum of possible meanings, describing a range extending from projects of relatively minor import to those of truly momentous proportions, the court's task is to indicate the point on this spectrum beyond which the seriousness of the foreseeable impact dictates preparation of an EIR.

In interpreting section 21151, our principal guide is the fact, recognized in *Friends of Mammoth,* "that the Legislature intended [CEQA] to be interpreted in such manner as to afford the fullest possible protection to the environment within the reasonable scope of the statutory. language." *(Friends of Mammoth* v. *Board of Supervisors, supra,* 8 Cal.3d at p. 259; accord, *County of Inyo* v. *Yorty* (1973) 32 Cal.App.3d 795, 804 [108 Cal.Rptr. 377]; see *Environmental Defense Fund, Inc.* v. *Coastside*

---

affect the environment even if the agency believes that effect to be beneficial rather than "adverse." (Cf. *Hiram Clarke Civic Club, Inc.* v. *Lynn* (5th Cir. 1973) 476 F.2d 421, 426-427 [NEPA]; *Goose Hollow Foothills League* v. *Romney* (D.Ore. 1971) 334 F.Supp. 877, 879 [NEPA].) One writer has also suggested that the term "substantial" imposes too high a threshold level for the preparation of EIRs. (Comment, *Aftermammoth: Friends of Mammoth and the Amended California Environmental Quality Act* (1973) 3 Eco.L.Q. 349, 367-368, fn. 111.) In the light of such criticism, the secretary for resources has announced that the resources agency will "do additional work" on this guideline, and schedule public hearings at a later date. (Letter from N. B. Livermore, dated Feb. 5, 1974, accompanying the issuance of the amended CEQA guidelines.)

Under these circumstances, we believe it would be inappropriate for us to utilize the present case to determine the validity of section 15040, or to preempt the Resources Agency by drafting an alternative definition. Our conclusion that the trial court's definition is patently erroneous is sufficient to decide the present appeal.

[16]As stated by Judge Friendly, construing the phrase "significantly affecting the quality of the human environment" in NEPA (42 U.S.C. § 4332): "While . . . determination of the meaning of 'significant' is a question of law, one must add immediately that to make this determination on the basis of the dictionary would be impossible. Although all words may be 'chameleons, which reflect the color of their environment,' *C.I.R.* v. *National Carbide Corp.,* 167 F.2d 304, 306 (2 Cir. 1948) (L. Hand, J.), 'significant' has that quality more than most. It covers a spectrum ranging from 'not trivial' through 'appreciable'·to 'important' and even 'momentous.' " *(Hanly* v. *Kleindienst* (2d Cir. 1972) 471 F.2d 823, 837 (dissenting opn. of Friendly, J.).) (For discussion of *Hanly* v. *Kleindienst,* see fn. 18, *infra.)*

Moreover, CEQA does not speak of projects which *will* have a significant effect, but those which *may* have such effect. Although we agree with the trial court that the word "may" connotes a "reasonable possibility," that phrase again encompasses a range of meaning extending from the most unlikely possibility which might influence the views of a reasonable man to events which fall but a hair short of certainty.

*County Water Dist., supra,* 27 Cal.App.3d at p. 701.) The EIR is the "heart" of CEQA (*County of Inyo* v. *Yorty, supra,* 32 Cal.App.3d at p. 810), the principal method by which environmental data are brought to the attention of the agency and the public. Consequently that interpretation of section 21151 which will "afford the fullest possible protection to the environment within the reasonable scope of the statutory language" (*Friends of Mammoth* v. *Board of Supervisors, supra,* 8 Cal. 3d at p. 259) is one which will impose a low threshold requirement for preparation of an EIR.[17]

As stated by Judge Friendly, discussing the federal act, "It is not readily conceivable that Congress meant to allow agencies to avoid this central requirement by reading 'significant' to mean only 'important,' 'momentous,' or the like. One of the purposes of the impact statement is to insure that the relevant environmental data are before the agency and considered by it prior to the decision to commit Federal resources to the project; the statute must not be construed so as to allow the agency to make its decision in a doubtful case without the relevant data or a detailed study of it." (*Hanly* v. *Kleindienst, supra,* 471 F.2d at pp. 837-838 (dissenting opinion).)[18]

In limiting the use of EIRs to projects which may have an "important" or "momentous" effect, the trial court adopted a test which will necessarily bar preparation of an EIR in those close and doubtful cases to which Judge Friendly referred, and will, to that extent, defeat the Legislature's objective of ensuring that environmental protection serve as the guiding criterion in agency decisions. (Pub. Resources Code, § 21001, subd. (d).) Indeed, the trial court test of "significant impact" imposes a far higher threshold barrier to the preparation of an EIR than any suggested in state or federal guidelines or in any reported decision; its

---

[17]"[I]n view of the clearly expressed legislative intent to preserve and enhance the quality of the environment . . ., the court will not countenance abuse of the 'significant effect' qualification as a subterfuge to excuse the making of impact reports otherwise required by the act." (*Friends of Mammoth* v. *Board of Supervisors, supra,* 8 Cal.3d at p. 271.)

[18]The majority opinion in *Hanly* v. *Kleindienst* (2d Cir. 1972) 471 F.2d 823 advanced the view that an environmental impact statement is not required in merely close and arguable cases *if* the agency submits, in lieu of such statement, a fully detailed explanation of its reasons for concluding that the project will not have a significant environmental effect. The majority in *Hanly* v. *Kleindienst* then reviewed a 25-page "Assessment of the Environmental Impact" prepared by a government agency to support its conclusion that a proposed jail would not significantly affect the environment, and held that this assessment was inadequate because it failed to include findings with respect to some relevant environmental considerations. (471 F.2d at p. 834.) Judge Friendly's dissent suggests that the agency could as easily have prepared an environmental impact statement.

interpretation affords not the fullest, but the least possible protection to the environment within the statutory language.[19]

■ In addition, the trial court added the gratuitous stipulation that no EIR is required unless the environmental effect of a project is "of a permanent or long enduring nature." We find no statutory warrant for this restriction; although the duration of an environmental effect is one of many facts which affect its significance, nothing in the act suggests that short-term effects cannot be of such significance as to require an EIR.

■ The trial court's test also erred in its omission of important considerations which called for the preparation of an EIR in the instant case. Evaluation of the environmental impact of the drilling project in the instant case required resolution of a factual dispute concerning the probability that the project might cause landslides or blowouts. In such cases, an EIR—an impartial, detailed, and factual analysis of the project's effect—can perform an invaluable service in aiding the agency's resolution of the dispute. As pointed out in *County of Inyo* v. *Yorty, supra,* 32 Cal. App.3d 795, 814, in such cases of factual controversy "The very uncertainty created by the conflicting assertions made by the parties as to the environmental effect . . . underscores the necessity of the EIR to substitute some degree of factual certainty for tentative opinion and speculation."

■ Thus we conclude, as did the court in *County of Inyo* v. *Yorty,* that an agency should prepare an EIR whenever it perceives "some substantial evidence that the project 'may have a significant effect' environmentally." (32 Cal.App.3d at p. 809.) As stated by Judge J. Skelly Wright in *Students Challenging Reg. Agency Pro.* v. *United States* (D.D.C. 1972) 346 F.Supp. 189, 201, an environmental impact report should be prepared "whenever the action *arguably* will have an adverse environmental impact." (Italics in original.)[20]

■ Furthermore, the existence of serious public controversy concerning the environmental effect of a project in itself indicates that prepara-

[19]Anderson, NEPA in the Courts (1973) reviews the federal decisions under NEPA and concludes that they have given the act "the widest possible scope of application" (p. 56) and imposed a "low threshold" for preparation of an environmental impact statement (the federal equivalent of California's environmental impact report).

[20]The United States Supreme Court noted jurisdiction in *Students Challenging Reg. Agency Pro.* v. *United States,* affirmed the district court's holding that the plaintiff had standing, but ruled that the district court lacked jurisdiction to enjoin the Interstate Commerce Commission. (*United States* v. *SCRAP* (1973) 412 U.S. 669 [37 L.Ed.2d 254, 93 S.Ct. 2405].) Its opinion does not discuss the standards for preparation of an environmental impact statement.

tion of an EIR is desirable.[21] ▆ One major purpose of an EIR is to inform other government agencies, and the public generally, of the environmental impact of a proposed project (see *County of Inyo* v. *Yorty, supra,* 32 Cal.App.3d 795, 810; *Environmental Defense Fund, Inc.* v. *Coastside County Water Dist., supra,* 27 Cal.App.3d 695, 704-705; cf. *Jones* v. *District of Columbia Redevelopment Land Agcy.* (D.C. Cir. 1974) 499 F.2d 502, 511 [NEPA]), and to demonstrate to an apprehensive citizenry that the agency has in fact analyzed and considered the ecological implications of its action. A simple resolution or Negative Declaration, stating that the project will have no significant environmental effect, cannot serve this function.

▆ Having decided that the trial court's instruction to the city council erred both in its definition of "significant impact" and in its omission of considerations suggesting the need for an EIR in the instant case, we must now determine whether that error prejudicially affected the proceedings before the city council. The principal issue here is whether the city council, on remand, did in fact employ the test stated by the trial court.

Upon the remand of the matter to the council, that body scheduled a public hearing on January 8, 1973, at which it received additional testimony and argument concerning the environmental effect of the drilling project. The council then resolved, by an eight-to-seven vote, not to require an EIR. Several councilmen explained their votes; four councilmen, two who favored and two who opposed the resolution, explicitly

---

[21]The federal guidelines for NEPA provide that "Proposed major actions, the environmental impact of which is likely to be highly controversial, should be covered in all cases." (Council on Environmental Quality, Guidelines on Preparation of Environmental Impact Statements, § 1500.6, 38 Fed. Reg. 20551 (1973).) These guidelines, first adopted in 1971, were in effect at the time of trial in the instant case. Since the California act was modeled on the federal statute, judicial and administrative interpretation of the latter enactment is persuasive authority in interpreting the California act. (See *Environmental Defense Fund, Inc.* v. *Coastside County Water Dist., supra,* 27 Cal.App.3d 695, 701.)

The state guidelines, which took effect while this case was pending on appeal, provide that "where there is, or anticipated to be, a substantial body of opinion that considers or will consider the effect [of the project] to be adverse, the lead agency should prepare an EIR to explore the environmental effects involved." (Cal. Admin. Code, tit. 14, § 15081.) Although defendants suggest that this language is intended to imply by omission that public opinion is relevant to the question of whether the project's net effect is "adverse," but not to the question whether that effect is "significant," this seems a wholly illogical interpretation. The need for a full report to provide information and quiet public apprehension is at least as great in cases, such as the present action, where the controversy concerns the risk of an admittedly adverse effect as in cases in which the controversy concerns whether a predicted effect is adverse or benign.

phrased their determination in terms of the trial court's test. Another councilman, who had previously voted in favor of the drilling districts, asked the city's assistant administrative officer for petroleum matters whether the effect of a blowout would have a "permanent long-enduring nature." Receiving a negative reply, he stated that he had heard nothing to change his mind, and voted for the resolution.

The record of the proceeding before the council on January 8 convinces us, as it did the trial court,[22] that the council employed the trial court's test in resolving against preparation of an EIR. Since that resolution carried by a bare eight-to-seven majority, we are compelled to conclude that the use of a test which limits EIRs to projects of momentous and semi-permanent effect, and which excludes the presence of disputed factual issues of public controversy as criteria suggesting preparation of a report, prejudicially affected the council's decision.[23]

 Defendants point out that the eight councilmen who voted in favor of the resolution filed declarations on December 6, prior to the trial court's pronouncement of its test of "significant effect," which stated that the oil drilling districts were not projects such as might have a significant environmental effect. Relying on these declarations, defendants contend that the eight councilmen had made up their minds before the

---

[22]On January 15, the court announced its intention to rule against plaintiffs. The judge observed that "[T]he court formulated a test to be applied in interpreting the language 'may have a significant effect on the environment,' the key phrase in these proceedings. This test is as follows: Is there a reasonable possibility that the project will have a momentous or important effect of a permanent or long-enduring nature? . . . With this test clearly in mind—it was alluded to in one form or another fourteen separate times by the city council—the council on January 8, without remand, adopted a resolution. . . . This court finds that that resolution is synonymous with a statement that the contemplated project is not one which may have a significant effect on the environment."

[23]Pointing to a letter by the city attorney dated October 3, 1973, defendants argue that the council, when it approved the ordinances, was aware that the then unmodified *Friends of Mammoth* opinion established a test requiring an EIR for all projects with a "nontrivial" effect. Defendants infer that the council, in approving those ordinances, silently employed that test and found that the drilling project would have only a trivial impact on the environment. Defendants also infer that the resolution of January 1973, stating the council's belief as of October 1972 that the project would not have a significant impact, referred to the definition of "significant effect" as "nontrivial effect" which the council inferably followed in October. Piling inference upon inference, defendants conclude that if the council consistently utilized the test of significant effect set out in the unmodified *Friends of Mammoth* opinion, the trial court's erroneous test could not have influenced the council's decision.

We reject the inferences proposed by the defendants. Our review of the council proceedings of October 10, October 17, and January 8 reveals no instance in which a councilman who voted in favor of the ordinances indicated that he did so on the basis of the "nontrivial effect" test of the unmodified opinion in *Friends of Mammoth*.

January 8 meeting; defendants imply that no test set out by the trial court—correct or incorrect—would have influenced them.

The argument is certainly a strange one. As the Attorney General points out, it is analogous to a contention that an erroneous jury instruction is not prejudicial because the jurors had already resolved to convict the defendant regardless of the court's instructions. When, as here, a court remands a case to an administrative agency with directions to follow a specific legal test, we must presume that the administrators faithfully followed those instructions. (See Evid. Code, § 664.)[24] The presumption is rebuttable, but the declarations of the councilmen filed prior to the trial court's statement of its test fall far short of showing that the council subsequently failed to follow that test.

■■■ Section 21168.5 permits a court to reverse a determination of a public agency for "prejudicial abuse of discretion." "Abuse of discretion is established if the agency has not proceeded in a manner required by law." (Pub. Resources Code, § 21168.5.) The council's use of an erroneous legal standard constitutes a failure to proceed in the manner required by law. (See *Gilles* v. *Department of Human Resources Development* (1974) 11 Cal.3d 313, 329 [113 Cal.Rptr. 374, 521 P.2d 110].)

The record in this case demonstrates that this error of law was prejudicial. The present case, in fact, is an excellent example of those close and arguable cases in which an EIR should be prepared. With the council confronting allegations, supported by expert testimony but controverted by opposing testimony, that the drilling projects could cause an environmental disaster, the value of an impartial environmental analysis cannot be gainsaid. The intense and continuing public concern with these hazards, and with the impact of oil drilling in the vicinity of public beaches and residential neighborhoods, equally suggests the need for a thorough and impartial study. Under these circumstances, we believe that the council, employing a proper test, would have decided to direct preparation of an EIR.

### 4. *Conclusion.*

For the reasons stated in parts 2 and 3 of this opinion, we conclude that the judgment of the superior court must be reversed. The superior court shall set aside the ordinances establishing the oil drilling districts on the ground that the city, in enacting these ordinances, failed to comply with the provisions of CEQA. The city, of course, may choose to re-

[24]Evidence Code section 664 states that "It is presumed that official duty has been regularly performed." This is a rebuttable presumption going to the burden of proof. (Evid. Code, § 660.)

enact these ordinances after complying with the requirements of that act.[25]

The judgment is reversed, and the cause remanded to the superior court to proceed in accordance with the views herein expressed.[26]

Wright, C. J., Sullivan, J., and Molinari, J.,* concurred.

**CLARK, J.**—I dissent.

When enacting a zoning ordinance in 1972, the Los Angeles City Council was not required to render a written Negative Declaration to evidence its determination that the ordinance would have no significant effect on the environment. There was no express requirement of such writing and no basis for implying one. The city council proceeded in a manner required by law, and the evidence before us fully supports the determination that the proposed test holes will have no significant effect on the environment.

In enacting the present zoning ordinances, the city council performed a legislative function. (*Johnston* v. *City of Claremont* (1958) 49 Cal.2d 826, 835-836 [323 P.2d 71]; *Clemons* v. *City of Los Angeles* (1950) 36 Cal.2d 95, 98 [222 P.2d 439]; *Lockard* v. *City of Los Angeles* (1949) 33 Cal.2d 453, 460 [202 P.2d 38].) As recognized by the majority (*ante,* pp. 74-75), the city council was not required to hold an evidentiary hearing, and judicial review of the council's action is governed by traditional mandamus principles rather than the administrative mandamus procedure of Code of Civil Procedure section 1094.5. (Pub. Resources Code, §§ 21168, 21168.5, 21168.7.) Thus the requirement of administrative findings set forth in section 1094.5 (see *Topanga Assn. for a Scenic Community* v. *County of Los Angeles* (1974) 11 Cal.3d 506, 511, 522 [113 Cal.Rptr. 836, 522 P.2d 12]) is not applicable to the adoption of the ordinances,[1] and no other principle of general law or charter provision has been cited or found requiring the Los Angeles City Council to make findings of fact in adopting ordinances.

---

[25]Occidental suggests than an opinion requiring the trial court to set aside the ordinances will require Occidental to file new applications for the creation of the drilling districts, and compel the city to follow anew all procedural steps preparatory to the enactment of the ordinance. To quiet such apprehensions, we note that our opinion does not compel the trial court to vacate any action, such as the filing of an application for an ordinance, which may lawfully precede the city's determination whether to prepare an environmental impact report. Occidental has not called our attention to any ordinance or rule of the City of Los Angeles which would, under the circumstances of this case, compel repetition of any actions which may lawfully precede that determination.

[26]In view of our disposition of this appeal, plaintiffs' motion for leave to produce new evidence on appeal is moot.

*Assigned by the Chairman of the Judicial Council.

[1]The statement of the majority that Occidental in seeking rezoning was circumventing the requirement of a conditional use permit is misleading and unfortunate. (*Ante,* p. 76.) In *Topanga,* the court stated that rezoning was the appropriate method to obtain a special use for a large parcel. (11 Cal.3d at p. 522.)

There is no express provision in the California Environmental Quality Act (Pub. Resources Code, § 21000 et seq.) (hereinafter CEQA),[2] as enacted in 1970 or in its present form, requiring prior to project approval either "findings" or any written determination that a project will not have a significant effect on the environment. To the contrary, the language of CEQA indicates that written findings were not contemplated for such a determination. Section 21168.5 provides that abuse of discretion may be established either by showing that the agency failed to proceed in a manner required by law or by showing that the *"determination or decision"* is not supported by substantial evidence. (§ 21168.5; italics added.) Clearly the act contemplates *only* that the determination be made. If the Legislature had intended written findings, it could easily have said that abuse of discretion is established when the decision is not supported by the *findings,* or the *findings* are not supported by substantial evidence. (Cf. Code Civ. Proc., § 1094.5; *Topanga Assn. for a Scenic Community* v. *County of Los Angeles, supra,* 11 Cal.3d 506.)[3]

---

[2] Unless otherwise stated, all statutory references are to the Public Resources Code.

[3] The absence of an express statutory requirement of "findings" distinguishes the instant case from *Topanga.* In *Topanga* we determined that the administrative mandamus procedure of Code of Civil Procedure section 1094.5, by providing that abuse of discretion is established if the administrative decision " 'is not supported by the findings, *or* the findings are not supported by the evidence,' " required that agencies subject to review by administrative mandamus must set forth specific findings. (11 Cal.3d at p. 515.)

Our reasoning in *Topanga* was that the Legislature must have intended specific findings in view of the fact that it established the reviewing court's duty to compare the evidence and ultimate decision to " '*the* findings' . . ." (11 Cal.3d at p. 515; italics added.) We noted that "[i]f the Legislature had desired otherwise, it could have declared as a possible basis for issuing mandamus the absence of substantial evidence to support the administrative agency's *action.*" (11 Cal.3d at p. 515; italics added.) On the basis of the *Topanga* rationale we must conclude the Legislature did *not* intend findings in the case of CEQA, for it has provided that the evidence be compared only to the "determination or decision" of the agency. (§ 21168.5.)

The majority disclaims having imposed any requirement of findings on the legislative process, stating that it requires only that the determination of no significant effect on the environment be put in writing. (*Ante,* p. 81.) The majority reasons that in the absence of such writing there is no way a court can tell if the agency actually made the determination. If this is the case, the requirement would seem fully satisfied by either the declarations of the councilmen submitted prior to trial or the council resolution of 8 January 1973. These eliminate the majority's objection to the record, i.e., they show that a determination was in fact made prior to approval of the ordinances.

By the lengthy impeachment of the council resolution (*ante,* pp. 82-88), however, the majority requires more of a negative declaration than a mere written statement of the fact of determination. The resolution adequately satisfied the only *formal* requirement *purportedly* imposed by the majority. By going behind the resolution, the majority in effect requires not only that the determination be reduced to writing but also that it affirmatively evidence proper supporting reasons.

Further support for the conclusion that CEQA did not require a written Negative Declaration is furnished by this court's decision in *Friends of Mammoth* v. *Board of Supervisors* (1972) 8 Cal.3d 247, 270 [104 Cal. Rptr. 761, 502 P.2d 1049]. *Friends of Mammoth* expressly rejected a requirement of written findings when an agency approves a project after preparation of an environmental impact report. It appears inconsistent to imply a requirement of written findings for a determination that no environmental impact report is necessary when this court refused to imply a requirement for such findings for the more important decision whether to approve a project in light of the admitted adverse environmental effects disclosed by an environmental impact report.

Sound practical considerations militate against the implication of formalistic requirements into the legislative process. When the legislative body has complied with all substantive requirements and all express formalistic requirements, the majority's will should not be frustrated by adding a formalistic requirement, the necessity for which could only be foreseen by those possessing acute clairvoyance.

The unreasonableness of implying a formalistic requirement into the legislative process is dramatically illustrated by the requirement implied by the majority today. Unless the legislative body somehow anticipated today's implied requirement of a written determination, every ordinance affecting the use of land adopted between the enactment of CEQA in 1970 and the adoption of the guidelines in 1973 has been improperly adopted, including ordinances involving projects where "it can be seen with certainty that the activity in question will not have a significant effect on the environment." Although projects coming within the quoted term are presently exempt from the written Negative Declaration requirement expressly imposed by the guidelines (Cal. Admin. Code, tit. 14, § 15060), the guidelines with the three-tiered structure relied upon by the majority were not adopted until 1973.[4] Probably thousands of ordi-

---

[4]The 1972 amendments to CEQA provide that the guidelines shall contain a list of classes of projects which the Secretary of the Resources Agency has found do not have a significant effect on the environment. (§ 21084.) A project falling within these classes is exempt from the provisions of CEQA. (§§ 21084, 21085.) The guidelines presently contain a list of such projects. (Cal. Admin. Code, tit. 14, §§15100-15112.) However, CEQA itself does not exempt any projects other than ministerial ones and emergency repairs to public service facilities (§§ 21080, 21085); hence there were no projects other than those mentioned in CEQA which were exempt until promulgation of the guidelines.

In general the guidelines establish a three-tiered structure—projects for which an EIR is filed; projects for which a Negative Declaration is filed, and categorically exempt projects. However, only a two-tiered structure is provided as to the type of

nances including those coming within the quoted term were not properly adopted under today's majority opinion.[5]

In imposing the requirement of a written determination on the legislative process, the majority also starts us down a dangerous path which, if followed in the future, will have unfortunate consequences. The majority implies the requirement not on the basis of language dealing with writings; the only language relied on is that set forth in the purposes of the act. However laudable or noble the purposes of a statute, the method to be followed by the city council in adopting ordinances under it should remain the same unless the statute itself or authorized regulations provide for a different method of enactment. To vary the method of enactment, depending upon judges' opinions as to the virtues of statutory purpose, is an improper interference with the legislative process and can only lead to confusion and frustration of the majority's will.

Since the city council was not required to produce written findings of fact or a written determination in the form of a Negative Declaration, it must be presumed that official duty has been regularly performed (Evid. Code, § 664) and that the legislative body has ascertained the existence of those facts essential to its action (e.g., *Orinda Homeowners Committee* v. *Board of Supervisors* (1970) 11 Cal.App.3d 768, 775 [90 Cal.Rptr. 88]). As the council passed the ordinances without preparing an EIR, it must be presumed it had determined the informational holes would not have a significant effect on the environment.

Evidence of events occurring after the 17 October 1972 passage of the ordinances, including submission of declarations by the councilmen and the council resolution of 8 January 1973 (both of which stated that the ordinances were approved on 17 October 1972, because the council believed the limited drilling would have no significant effect on the en-

---

ordinance before us. Activities for the purpose of "basic data collection" or "resource evaluation" are categorically exempt unless the activity will result in a "serious or major disturbance to an environmental resource." (Cal. Admin. Code, tit. 14, § 15106.) If the activity would result in a "serious or major disturbance to an environmental resource," it would seem perforce that an EIR is required. If not, the activity is exempt. In the instant case, if the city council finds such a disturbance, an EIR must be prepared. If it does not so find, there is not even a requirement of a Negative Declaration, for the guidelines do *not* require filing of a Negative Declaration when a public agency approves a project that is categorically exempt. (Cf. Cal. Admin. Code, tit. 14, § 15035.5.)

[5]Since the majority has implied the writing requirement, it could imply the exemption too—once the fabric is woven from thin air, it may be embellished at will. Nevertheless, implication of the requirement and the exemption in the absence of any language dealing with writing requirements or exemptions from them appears a clear invasion of the legislative process.

vironment) does not establish that the council failed to make the determination. If anything the evidence tends to support the presumption that the determination was made.[6] In any event it was unnecessary for defendants to prove that the determination was actually made, for the issue should have been resolved in their favor when plaintiffs failed to adduce evidence sufficient to overcome the presumption.

I conclude the council proceeded in a manner required by law. The inquiry thus is whether the council's determination is supported by substantial evidence. (§ 21168.5.) There is ample evidence in the record to sustain the decision. The ordinances contemplated drilling of extremely limited scope. Only two informational test bore holes were authorized; the entire operation was to last only 90 days, with the rigs to be removed upon completion; and a number of other restrictions and conditions were imposed on the project. Under no circumstances was commercial production of oil to be permitted. With respect to the impact of the drilling vibrations, Occidental produced expert testimony that vibrations from the drilling at a point 150 feet from the drill site would be less than those caused by movement along the nearby highway, and 5 to 10 times less than the ambient vibrations outside the courtroom door. As to the possibility of a "blowout," there was evidence that the incidence of blowouts at urban drill sites was only 2/10ths of 1 percent.[7] Occidental also introduced photographs demonstrating methods by which the drill site would be made aesthetically consonant with adjacent land uses. The foregoing represents only a sampling of the evidence marshalled by Occidental to dispel any doubts about the environmental effect of the test holes.

The limited drilling authorized by the ordinances is a "basic data collection" or "resource evaluation" activity inasmuch as the object of the drilling is to determine the size and yield of the Riviera oil field and obtain data essential to a thorough environmental assessment of oil production. Unless the city council determines that this activity will result in a "serious or major disturbance to an environmental resource" the proposed test holes will be *categorically exempt* from CEQA under the present guidelines. (Cal. Admin. Code, tit. 14, § 15106.) In the event

[6]In a 17-page letter of 3 October 1972 the city attorney advised the city council that all projects which may have a significant effect on the environment required preparation of an EIR and specifically concluded that all *zone* changes should be accompanied by an EIR if the permitted use may have a significant effect on the environment.

[7]The experts for plaintiffs conceded that the incidence of blowouts was "very low" and that the petroleum industry had developed "very sophisticated means" of preventing such accidents.

the council concludes the drilling will not result in a serious or major disturbance to an environmental resource, the city council will *not* be required to render a written Negative Declaration nor any writing whatsoever prior to approval of the ordinances, for the guidelines do not require *any* writing for a determination that a project is categorically exempt from CEQA. The agency "may" file a brief notice of exemption but is not compelled to. (Cal. Admin. Code, tit. 14, § 15035.5.) This observation only highlights the futility, as well as the inappropriateness, of the requirement which the majority implies today.

I would affirm the judgment.[8]

McComb, J., and Burke, J.,* concurred.

The petition of respondent Occidental Petroleum Corp. for a rehearing was denied January 29, 1975, and the opinion was modified to read as printed above. Molinari, J.,† sat in place of Mosk, J., who deemed himself disqualified. Clark, J., was of the opinion that the petition should be granted.

---

[8]The majority balks at resolving a number of questions highly pertinent to cases arising under CEQA, which I feel leaves the disposition of this case and others uncertain to an unfair extent. Specifically, the majority does not decide what is required in a Negative Declaration and declines to formulate a more definite test for determining what constitutes a "significant effect" on the environment. Thus, while the city council must now redetermine the environmental issues involved, it does not even have assurance that adherence to the standards set forth in the guidelines is the proper course to pursue. The majority remands the case without informing the council what is expected of it in future deliberations.

The unwarranted aspersions cast by the majority on the application of the political process in this case perhaps explain the majority's willingness to reach its desired result without confronting the important questions of law. The record, however, provides no basis for believing the political channels were abused in any manner.

*Retired Associate Justice of the Supreme Court sitting under assignment by the Chairman of the Judicial Council.

†Assigned by the Chairman of the Judicial Council.