[Civ. No. 44484. First Dist., Div. Two. May 21, 1980.]

STEPHEN J. KENNEDY, Plaintiff and Appellant, v.
CITY OF HAYWARD, Defendant and Respondent;
FIRST RIDGEWOOD COMPANY et al., Real Parties in Interest and
Respondents.

**Counsel**

Fred F. Cooper for Plaintiff and Appellant.

John Scanlon, City Attorney, and Myron A. Johnson, Assistant City Attorney, for Defendant and Respondent.

Chris G. Gasparich, Stephen G. Blitch and Crosby, Heafey, Roach & May for Real Parties in Interest and Respondents.

**Opinion**

**TAYLOR, P. J.**—Steven J. Kennedy, the owner of a contiguous lot, appeals from a judgment denying his petition for a writ of mandate to

require the City of Hayward (City) to set aside an order of its planning commission (Commission) approving a lot split application. The real parties in interest are First Ridgewood Company (First Ridgewood), the developer, and Betsy Bracy and Gail Jacobs, the owners of one of the parcels created by the lot split. We have concluded that the judgment must be reversed, as Kennedy was deprived of his due process rights to notice and a hearing pursuant to *Horn* v. *County of Ventura* (1979) 24 Cal.3d 605 [156 Cal.Rptr. 718, 596 P.2d 1134], and as the court below applied a traditional mandamus standard of review rather than the applicable administrative mandamus standard (*Horn, supra*).

The record reveals the following pertinent chronology: In 1972, First Ridgewood obtained approval from the City for a subdivision map of tract 3432.[1] Lot 4, of the total of 17 lots comprising this tract, was left undeveloped but subject to future development by way of lot splits. Lot 4 is an undeveloped hillside lot consisting of 17 acres and comprising the north wall of a canyon. Hayward Area Recreation and Park District owns an easement through lot 4 used for horseback riding and hiking. Kennedy owns and resides on a parcel contiguous to lot 4 on the southern rim of the canyon.

On March 1, 1977, First Ridgewood filed its application for a tentative parcel map dividing lot 4 into four separate lots[2] pursuant to the City's real estate subdivision regulation (Mun. Code, art. 3, § 10). Approval of the map was a "project" within the meaning of Public Resources Code section 21065, a part of the California Environmental

---

[1] An environmental impact report (EIR) was prepared and considered prior to the City approval of the 1972 subdivision of tract 3432. The 1972 EIR stated in pertinent part: "The proposed development would provide single family residences on all parcels except No. 4, which would remain essentially in its present natural state." The EIR also noted that "Parcel 4, including about 17 acres, is heavily covered with trees and brush, and has the steepest slopes in the tract," and further noted that "Parcel 4 is steep and not intended for development."

The 1972 EIR concluded as follows: "Imaginative planning, increased productivity due to irrigation, and the preservation of parcel 4 in its natural condition will provide a substantial net enhancement of wildlife values in this area."

Neither an easement of the Hayward Area Recreation and Park District nor the area's soil subsidence problems were indicated in the 1972 EIR.

[2] City subdivision regulations designate a subdivision into four parcels or less as a "lot split" which, therefore, *exempts* the instant lot split from the Subdivision Map Act which governs "all subdivisions creating five or more parcels ..." (Gov. Code, § 66426; see also *Horn* v. *County of Ventura, supra*, 24 Cal.3d, at p. 610; *County of San Mateo* v. *Palomar Holding Co.* (1962) 208 Cal.App.2d 194, fn. 1, p. 199 [24 Cal.Rptr. 905]).

Quality Act (CEQA), set forth below,[3] and a "discretionary project" within the meaning of California Administrative Code, title 14, section 15024, also set forth below.[4]

In CEQA, the Legislature sought to protect the environment by the establishment of administrative procedures drafted to "[e]nsure that the long term protection of the environment shall be the guiding criterion in public decisions" (Pub. Resources Code, § 21001, subd. (d)). To achieve these objectives, CEQA and the state implementing guidelines establish a three-tiered structure of determinations. As a threshold matter, if a project is categorically exempt by administrative regulation (see Pub. Resources Code, §§ 21084, 21085) or if the local agency determines that "it can be seen with certainty...that the activity in question may not have a significant effect on the environment" (Cal. Admin. Code, tit. 14, § 15060), no further agency evaluation is required. Moreover, neither the further requirements of CEQA nor the guidelines of the California Administrative Code, title 14, concerning the evaluation of projects and the preparation and review of environmental documents apply (*No Oil, Inc.* v. *City of Los Angeles* (1974) 13 Cal.3d 68, 74 [118 Cal.Rptr. 34, 529 P.2d 66]).

Here, the environmental determination was made pursuant to California Administrative Code, title 14, section 15060, set forth below[5]

---

[3]Public Resources Code section 21065: "'Project' means the following: [¶] (a) Activities directly undertaken by any public agency. [¶] (b) Activities undertaken by a person which are supported in whole or in part through contracts, grants, subsidies, loans, or other forms of assistance from one or more public agencies. [¶] (c) Activities involving the issuance to a person of a lease, permit, license, certificate, or other entitlement for use by one or more public agencies."

[4]California Administrative Code, title 14, section 15024: "Discretionary project means *an activity defined as a project which requires the exercise of judgment, deliberation, or decision on the part of the public agency* or body in the process of approving or disapproving a particular activity, *as distinguished from situations where the public agency or body merely has to determine whether there has been conformity with applicable statutes, ordinances, or regulations.*" (Italics added.)

[5]"*The requirements set forth in these Guidelines apply to projects which may have a significant effect on the environment* and which involve discretionary governmental action. *Where it can be seen with certainty that there is no possibility that the activity in question may have a significant effect on the environment, the activity is not covered by the requirements set forth in CEQA, and these Guidelines concerning the evaluation of projects* and the preparation and review of environmental documents *do not apply.*" (Italics added.)

Public Resources Code section 21085 provides that no environmental study is required if a project comes within a category exempt by administrative regulation (not applicable here), or satisfies the requirement emphasized above in section 15060.

(State Environmental Guidelines) and section 3.1, subdivision (a) of the City guidelines, also set forth below.[6]

Between March 1, 1977, and June 24, 1977, M. Carash, the City's senior planner, visited the property and reviewed: 1) referral responses from the public works department and other agencies; 2) aerial photographs of the site; 3) the lot split map; 4) comparable development in the immediate area; 5) the 1972 EIR; and 6) the applicability of other City procedures to insure safety and appropriateness of the proposed lot split.

Applying the above quoted state and city guidelines, Carash determined that the proposed split of lot 4 "will not have a significant effect on the environment" and, therefore, was not subject to CEQA. Under the applicable provisions of the City subdivision ordinance, set forth below,[7] Carash's determination could have become final without any action whatsoever by the Commission or a notice or hearing to anyone.

---

[6]"(a) *As part of the usual application processing* procedures, the *City representative shall review the application* of anyone wishing to carry out an activity subject to these provisions *and make a determination within a reasonable time after receipt* whether the application constitutes an activity which falls under the requirements of CEQA *or is an exempt* or non-exempt *project* as defined by CEQA and herein." (Italics added.)

[7]The pertinent provisions of the City subdivision regulations are contained in article 3, section 10, Hayward Municipal Code, as follows:

"SEC. 10-3.131 APPROVAL PROCEDURE. PLANNING DIRECTOR. If the Planning Director determines that the design of the proposed subdivision is in conformity with all applicable regulations of the City, all the proposed lots will have proper and sufficient access to a public street, public street openings or widenings are not necessary, and the subdivision promotes the interests of the general public, the Planning Director, or his designee, after consulting interested agencies and/or City Departments, *may approve* or *conditionally approve* any Lot Split Map, *or he may refer the application and pertinent data to the Planning Commission for consideration....*" (Italics added.)

"Action of approval, conditional approval, or disapproval shall be effective upon expiration of the period hereinafter provided for appeal. (As added by Ordinance No. 66-008 C.S., adopted March 1, 1966.)"

"SEC. 10-3.132 APPEAL TO PLANNING COMMISSION. PROCEDURE. *To provide recourse to the Planning Commission from any decision* or determination made by the Planning Director in the administration, interpretation, approval, or disapproval of a Lot Split Map, *any person aggrieved by the action of the Planning Director may appeal in writing to the Planning Commission within ten (10) days after action taken by the Planning Director. Any appeal shall stay all proceeding* in furtherance of the action appealed. (As added by Ordinance No. 66-008 C.S., adopted March 1, 1966.)" (Italics added.)

"SEC. 10-3.133 ACTION BY THE PLANNING COMMISSION UPON REFERRAL OR APPEAL. Upon appeal of action by the Planning Director upon a subdivision application or upon referral of an application, the Planning Commission shall determine whether the design of the proposed subdivision is in conformity with all applicable reg-

In the case of lot 4, however, in order to "maximize public awareness of the project," Carash sent the lot split application to the Commission for its consideration and approval. On June 1, 1977, although neither the City nor the Commission was required by law to provide notice of the pendency of the application, a copy of the application was provided to the Woodland Estates Homeowners Association (Association), of which Kennedy was automatically a member as a result of the covenants and conditions of the subdivision in which his home is located. The Association asked for details of the proposed development and a one-month continuance of the hearing to review the application. The City responded summarily that no continuance would be granted, since no further information had been submitted on the matter.

The tentative parcel map was then approved by the Commission at a duly held regular meeting on June 30, 1977. Although general notice of the Commission meeting was given to various members of the general public, no specific notice of the lot split application was given. An Association representative was present. No notice of the Commission's meeting was given to Kennedy. No findings were made by the Commission. The time to appeal the Commission's decision expired on July 10, 1977; no appeal was filed. Immediately after the expiration of the appeal period, First Ridgewood sold one of the lots to Bracy and Jacobs.

Kennedy learned of the lot split on Saturday, August 20, 1977. On Monday, August 22, Kennedy discovered that no EIR or negative declaration had been filed, and wrote a letter to the city attorney. On September 23, 1977, he filed his petition for a writ of mandate, alleging that by approving the lot split without an EIR or negative declaration,[8]

---

ulations of the City and whether all the proposed lots will have proper and sufficient access to a public street."

"SEC. 10-3.14 APPEAL TO CITY COUNCIL. PROCEDURE. *To provide recourse to the City Council from any decision or determination made by the Planning Commission in the administration and interpretation of a Lot Split Map, any person aggrieved by the action of the Planning Commission may appeal in writing to the City Council within ten (10) days after action taken by the Planning Commission. An appeal shall stay all proceedings* in furtherance of the action appealed." (Italics added.)

"SEC. 10-3.15 APPEAL: ACTION BY THE CITY COUNCIL. Upon completion of its consideration, the *City Council may approve*, modify or reject, wholly or partly, the *determination of the Planning Commission*, and may make such decision or determination as the facts warrant, *and its decision or determination shall be final.*" (Italics added.)

[8]A *negative declaration* is a written statement briefly describing the reasons a proposed project will not have a significant effect on the environment and does not require the preparation of an EIR (Pub. Resources Code, § 21064).

the City had not complied with CEQA and that by the Commission's action, he had been deprived of his due process rights to notice and a hearing.

At the hearing, it was determined that the proceeding was one for traditional mandamus under Code of Civil Procedure section 1085. Kennedy adduced expert evidence of subsidence and soil slippage and slide problems that would be exacerbated by the proposed lot split. Kennedy's expert Pilecki opined that the development of lot 4 could jeopardize the entire area, including existing homes on the south ridge of the canyon.[9] Another owner testified about two landslides that had damaged property on the south ridge and other subsidence and slide problems.

Carash indicated that the environmental considerations raised by Kennedy were not "significant." The City engineer, who reviewed the excavation, soils and grading aspects of the building permit issued to Bracy and Jacobs, concurred.

The court viewed the property and then applied the traditional mandamus test of Code of Civil Procedure section 1085 to conclude that: 1) there was no substantial evidence known or presented to Carash or the court that the proposed lot split would have a significant effect on the environment; 2) no notice of the Commission's meeting was given and none was required; and 3) the City did not abuse its discretion in approving the lot split.

Subsequently, our Supreme Court decided *Horn v. County of Ventura, supra,* 24 Cal.3d 605, which involved a similar lot split into four parcels. In *Horn,* as here, an adjoining property owner complained that the local agency's environmental review processes were constitutionally inadequate.[10] ■ Our Supreme Court agreed and held (at p. 612) that due process principles require reasonable notice and an opportunity to be heard before governmental deprivation of a significant property interest.

[9]The City requested but was refused a finding that Pilecki's testimony was speculative and based on an insufficient foundation of fact; Kennedy requested but was refused a finding of the possibility of a significant effect on the environment.

[10]In Horn, a negative declaration was made, thus clearly bringing the action within CEQA (Pub. Resources Code, § 21064). The negative declaration recited that the proposed subdivision would not have a significant effect on the environment. The county's CEQA guidelines provided for posting of all CEQA documents in three different coun-

The court then further indicated at page 612 that only adjudicative governmental processes (as distinct from legislative ones) were subject to procedural due process principles. The court then pointed out at page 614 that since subdivision approvals, like variances and conditional use permits, involved the application of general standards to specific parcels of real property, affected relatively few and were determined by facts peculiar to the individual case, they were adjudicatory in nature. ■ The court held at page 614 that subdivision approvals were subject to the adequate findings requirement of *Topanga Assn. for a Scenic Community* v. *County of Los Angeles* (1974) 11 Cal.3d 506 [113 Cal. Rptr. 836, 522 P.2d 12], and were to be reviewed by the administrative mandamus standard of Code of Civil Procedure section 1094.5.

The court, at 24 Cal.3d page 615, rejected a contention that subdivision approvals are purely "ministerial" acts, reasoning that they involve "the exercise of judgment, and the careful balancing of conflicting interests, the hallmark of the adjudicative process. The expressed opinions of the affected landowners might very well be persuasive to those public officials who make the decisions, and affect the outcome of the subdivision process."

■ The court then further held, at page 615, that land use decisions which "substantially affect" the property rights of owners of adjacent parcels *may* constitute "deprivations" of property within the context of procedural due process.[11] Thus, whenever approval of a tentative subdivision map will constitute a substantial or significant deprivation of the property rights of other landowners, the affected persons are entitled to a reasonable notice and an opportunity to be heard *before* the approval occurs.

---

ty offices, and notice by mail to interested citizens on request. Thereafter, the planning department approved the tentative map upon certain conditions, from which Horn appealed to the board of supervisors. No notice was given to adjoining property owners prior to this action. Horn learned by chance of the departmental approval and appeared at the appeal hearing. Because no notice and opportunity for hearing had yet been given to affected property owners, Horn asked that the board refer the proposal back to the planning department for a noticed public hearing and further study of the project's environmental effects. This request and a subsequent one were denied and the subdivision was approved with modified conditions.

[11]The court indicated, however, that constitutional notice and hearing requirements are triggered only by governmental action which results in "significant" or "substantial" deprivations of property and not by agency decisions having only a de minimis effect on land or involving only the nondiscretionary application of objective standards.

■ *Horn, supra*, compels the conclusion that here, Kennedy, as an adjacent owner, was deprived of a significant property interest without due process. As indicated above, the City determined that the lot split was exempt from CEQA. Once this determination of threshold exemption is made, no further action by the local agency is required under CEQA as none of the CEQA requirements or procedures apply. Further, under the applicable provisions of the City's subdivision ordinance, the senior planner's environmental determination and his subsequent lot split approval could have become final without any action whatsoever by the planning commission. As a matter of grace, notice of the pending lot split was given to the Association prior to its final approval. The Commission then declined any further input from the Association or the public generally, and without further notice to Kennedy or other adjacent landowners, voted to approve the lot split. The City's procedures here also did not guarantee an affected landowner a meaningful predeprivation hearing.

■ The Supreme Court's discussion of the inadequacy of the particular notice and hearing requirements in *Horn, supra*, 24 Cal.3d at pages 617-618, are particularly apt here and dispose of the City's argument that the notice, in fact, given to the Association, and the presence of the Association's representative at the Commission hearing sufficiently protected Kennedy's due process rights. The court, at page 617, emphasized that independent of CEQA proceedings, the directly affected owner is entitled to a hearing that focuses on his particular concerns and the general feasibility and desirability of the project. ■ The court continued as follows: "The general application of due process principles is flexible, depending on the nature of the competing interests involved. [Citations.] ■ The extent of administrative burden is one of the factors to be considered in determining the nature of an appropriate notice. [Citations.] However, where, as here, prior notice of a potentially adverse decision is constitutionally required, that notice must, at a minimum, be reasonably calculated to afford affected persons the realistic opportunity to protect their interests. [Citations.]"

The court pointed to the inadequacy of the mail-request and central-posting methods of notice in issue, and continued at page 618: "While such posting and mailing may well suffice to encourage the generalized public participation in the environmental decision making contemplated by CEQA, they are inadequate to meet due process standards where fundamental interests are substantially affected. Those persons significantly affected by a proposed subdivision cannot reasonably be expected

to place themselves on a mailing list or 'haunt' county offices on the off-hand chance that a pending challenge to those interests will thereby be revealed. *Other forms of notice appear better calculated to apprise directly affected persons of a pending decision.*

"We deliberately refrain from describing a specific formula which details the nature, content, and timing of the requisite notice. Rather, we leave to the affected local governments these determinations. We do observe, however, that depending on (1) the magnitude of the project, and (2) the degree to which a particular landowner's interests may be affected, acceptable techniques might include notice by mail to the owners of record of property situate within a designated radius of the subject property, or by the posting of notice at or near the project site, or both. *Notice must, of course, occur sufficiently prior to a final decision to permit a 'meaningful' predeprivation hearing to affected landowners.*" (Italics added.)

The judgment is reversed.

Rouse, J., and Smith, J., concurred.